Jewel Louise CARR, Administratrix of the Estate of Carlos Carr, Deceased, Plaintiff,

v.

ST. PAUL FIRE & MARINE INSURANCE COMPANY, Defendant.

No. F-72-C-22.

United States District Court,
W. D. Arkansas,
Fayetteville Division.

Nov. 19, 1974.

---

8. This was not done in all cases.

Ronald G. Woodruff, Pearson & Woodruff, Fayetteville, Ark., for plaintiff.

Richard B. Shaw, Shaw & Ledbetter, Fort Smith, Ark., for defendant.

OPINION

JOHN E. MILLER, Senior District Judge.

This case was commenced May 20, 1972, when plaintiff, a citizen and resident of the State of Arkansas, filed her complaint against defendant, a foreign corporation authorized to do and in fact doing business in the State of Arkansas, to recover damages for alleged negligence on the part of Washington General Hospital and its employees in the treatment and failure to treat the decedent, Carlos Carr, who had been received in the emergency room of said hospital during the evening of January 8, 1972.

Washington General Hospital is owned and operated by Washington County, Arkansas, and is not subject to suit for damages under the laws of the State of Arkansas. The defendant, St. Paul Fire and Marine Insurance Company, is the insurer of said hospital and under Ark. Stat.Ann., § 66–3240 (1966 Repl.), is subject to suit for the recovery of damages caused by the negligence of the insured.

The plaintiff alleged that, relying on the practice and custom of the hospital which operated an emergency service and facilities, plaintiff's decedent, Carlos Carr, went to the hospital and "was refused treatment by the agent, employee and servant in charge after a superficial examination of the decedent; that said agent, employee and servant refused to call a physician or make any effort to have plaintiff's decedent examined by a qualified medical practitioner." That the hospital's employees failed to render to the decedent the necessary attention and service that his physical condition at the time required, and he was permitted to return to his home in Fayetteville, and died before or about midnight January 8, 1972, after leaving the hospital. It is further alleged that the decedent was permanently disabled

and died as a result of the negligence of the hospital as set forth in the complaint.

After removal of the case to the U. S. District Court for the Western District of Arkansas, Fayetteville Division, the defendant filed its answer on June 12, 1972, in which it denied that the hospital was negligent in the treatment or failure to treat the decedent.

The court has jurisdiction because of diversity of citizenship and the amount involved, 28 U.S.C.A. § 1332.

There was much delay not occasioned by the parties in the trial and disposition of the case.

On October 21, 1974, the case was tried to a jury which returned a verdict in favor of plaintiff, Jewel Louise Carr, Administratrix. It awarded damages of $35,000 for the use and benefit of the surviving widow as compensation for pecuniary damages, mental anguish and loss of consortium, and $40,000 for the benefit of decedent's minor children for mental anguish, loss of care and support, maintenance and educational opportunities.

At the close of plaintiff's evidence the defendant moved for a directed verdict in its favor which was not granted, and the defendant proceeded to introduce its evidence. At the conclusion of the trial the defendant renewed its motion for a directed verdict which was denied, and the court proceeded to submit the case to the jury upon the evidence, argument of counsel and applicable instructions.

█ There is now before the court defendant's motion for judgment notwithstanding the verdict, or, in the alternative, a motion for a new trial, timely filed under Rule 50, Fed.R.Civ.P.

The standards for granting a motion for judgment n. o. v. are the same as those governing the direction of a verdict.

In Schneider v. Chrysler Motors Corp. (8 Cir. 1968), 401 F.2d 549, the court at page 554 said:

"The standard in considering a motion for judgment notwithstanding the verdict is the same as the standard for directing a verdict. Compton v. United States, 377 F.2d 408, 411 (8 Cir. 1967); 2B Barron and Holtzoff, Federal Practice and Procedure § 1079, p. 412 (1961). Under either motion the question of sufficiency of the evidence to support a jury verdict is raised. The problem arises, in a diversity case in a federal court, whether the state or federal test of sufficiency of the evidence to support a jury verdict is to be applied."

In Compton v. United States, (8 Cir. 1967) 377 F.2d 408, an Arkansas case, the court, by Judge Mehaffy, beginning on page 411 said:

"The standard required for entry of judgment n. o. v. is the same as is required for a directed verdict, and, unless it can be said that reasonable persons cannot disagree as to the facts or inferences drawn therefrom, the jury verdict must stand. * * * A judge's disagreement with conclusions reached by a trier of facts is not a valid reason for setting aside the jury's conclusion. * * * The jury—and not the court—is the ultimate factfinding body, and, so long as divergent conclusions may be reasonably drawn from the evidence, a jury verdict may not be disturbed. * * * The question for the court is not whether or not a verdict is against the weight of the evidence, since this is a question for the jury to decide. It is only where there is no evidence of substance upon which reasonable men could differ that the trial court is empowered to set the jury verdict aside. * * * A jury's verdict should never be preempted by the court unless it has no foundation in fact. * * * A court should not direct a verdict, even where the evidence was uncontradicted, where conflicting, permissible inferences may be drawn." (Citations omitted.)

In Dun & Bradstreet, Inc., v. Nicklaus (8 Cir. 1965), 340 F.2d 882, the court at page 885 said:

"When the sufficiency of the evidence is questioned, the Arkansas and Federal courts will view the evidence in the light most favorable to the plaintiff. Superior Forwarding Co. v. Garner, 236 Ark. 340, 366 S.W.2d 290; Aetna Life Ins. Co. v. McAdoo, 8 Cir., 115 F.2d 369; Stofer v. Montgomery Ward, 8 Cir., 249 F.2d 285.

"The federal standard for testing the sufficiency of the evidence requires that there be 'substantial evidence' to support the verdict. Hanson v. Ford Motor Co., 8 Cir., 278 F.2d 586, 590."

In Breeding v. Massey (8 Cir. 1957), 378 F.2d 171, an Arkansas case, the court at page 176 said:

"The trial court properly overruled the motions of Hugh Breeding, Inc., for a directed verdict and judgment n o. v. In determining the sufficiency of the evidence to support a verdict, the established rule is that the evidence, including all reasonable inferences to be drawn therefrom, must be viewed in the light most favorable to the prevailing party. Dun & Bradstreet, Inc. v. Nicklaus, 8 Cir., 340 F.2d 882, 885; Hanson v. Ford Motor Co., 8 Cir., 278 F.2d 586, 590.

"The motions would be entitled to be sustained only if there is no substantial evidence to support any ground for recovery."

In Glidewell, Admr., v. Arkhola Sand & Gravel Co. (1948), 212 Ark. 838, 208 S.W.2d 4, the court at page 839 of 212 Ark., at page 6 of 208 S.W.2d said:

"The rule is well settled that in testing the sufficiency of the evidence where there has been a directed verdict, as here, if there is any substantial evidence, it is the duty of the trial court to submit the question to the jury, and in making this test, the evidence and all reasonable inferences deducible therefrom must be viewed in the light most favorable to the party against whom the verdict was directed. Collett v. Loews, 203 Ark. 756, 158 S.W.2d 658."

In Bennett v. Wood (8 Cir. 1959), 271 F.2d 349, an Arkansas case, the court at page 351 said:

"The plaintiff and the trial court rely upon Anglen v. Braniff Airways, 8 Cir., 237 F.2d 736, and Continental Can Co. v. Horton, 8 Cir., 250 F.2d 637. Plaintiff cites these cases in support of her contention that a jury can choose between two conflicting theories of a collision. Plaintiff overlooks the limitation that such choice can be made only when the inferences upon which such theories are based can reasonably be drawn from the evidence. That such limitation exists is made clear by a careful examination of the cases as a whole and the rule applied in each of said cases, reading (at page 643 of 250 F.2d):

" '* * * In a jury case, where conflicting inferences reasonably can be drawn from the evidence, it is the function of the jury to determine what inferences shall be drawn.' * * * (Emphasis supplied.)"

In Superior Forwarding Co. v. Garner (1963), 236 Ark. 340, 366 S.W.2d 290, the court, beginning at bottom of page 346 of 236 Ark., of page 295 of 366 S.W.2d, said:

"The burden was upon the appellee to produce some substantial evidence from which the jury might find some act or omission constituting negligence by the appellants as alleged in appellee's complaint. Such evidence can be established either by direct or circumstantial evidence but the appellee cannot rely upon inferences based on conjecture or speculation in order to establish proof of negligence."

In Henry H. Cross Co. v. Simmons (8 Cir. 1938), 96 F.2d 482, an Arkansas case, the court at page 486 said:

"To submit to a jury a choice of possibilities is but to permit the jury to conjecture or guess, and where the

evidence presents no more than such choice it is not substantial, and where proven facts give equal support to each of two inconsistent inferences, neither of them can be said to be established by substantial evidence and judgment must go against the party upon whom rests the burden of sustaining one of the inferences as against the other."

In Moran v. State (1929) 179 Ark. 3, 13 S.W.2d 828, the court at page 7 of 179 Ark., at page 830 of 13 S.W.2d, said:

"It is not allowable, under the rules of evidence, to draw one inference from another, or to indulge presumption upon presumption to establish a fact. Reasonable inferences may be drawn from positive or circumstantial evidence, but to allow inferences to be drawn from other inferences, or presumptions to be indulged from other presumptions, would carry the deduction into the realm of speculation and conjecture."

See, also, Martin v. Arkansas Power & Light Co., 204 Ark. 41, 161 S.W.2d 383; 20 Am.Jur., § 165, p. 169.

In Ozark Air Lines, Inc., v. Larimer (8 Cir. 1965), 352 F.2d 9, the court at page 11 said:

"Because jurisdiction is here based upon diversity of citizenship, the question arises whether to apply a state or federal test of sufficiency of the evidence to support a jury verdict. In Dick v. New York Life Ins. Co., 359 U.S. 437, 444–445, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959), the Supreme Court acknowledged the question but declined decision until more critically presented. When before this court, either the parties have assumed that the state law controlled or we have found the state and federal standards to be without appreciable difference. Jiffy Markets, Inc. v. Vogel, 340 F.2d 495, 498 (8th Cir. 1956) and cases there cited; United States Rubber Co. v. Bauer, 319 F.2d 463 (8th Cir. 1963); Bankers Life & Cas. Co. v. Kirtley, 307 F.2d 418 (8th Cir. 1962)."

The court is of the opinion and so holds that in a diversity case in a federal court that the federal test and the test under the law of Arkansas to determine the sufficiency of the evidence to support a verdict are substantially the same, and it is not necessary to decide which test should be followed. United States Rubber Co. v. Bauer (8 Cir. 1963), 319 F.2d 463, 465.

An excellent and comprehensive summary of the general principles of law to be applied in determining the standard of care required of a hospital was stated by Judge Gerald W. Heaney on page 601 of Jeanes v. Milner (8 Cir. 1970), 428 F.2d 598, where the court held that "a hospital is required to provide that degree of care and attention to its patients as the circumstances require (citations omitted). A directed verdict at the close of the plaintiff's evidence should be sparingly granted as it deprives the plaintiff of a determination of the facts by a jury (citations omitted). We view the evidence in the light most favorable to the plaintiff giving her the benefit of every favorable inference which may be fairly drawn. (Citations omitted.)"

The parties have submitted excellent briefs in support of their respective contentions, which the court will discuss seriatim.

The defendant contends and argues:

"A. The plaintiff has failed to establish any act of negligence on the part of Ruth Nail or the emergency room personnel or the Washington Regional Medical Center.

"B. Under the laws of the State of Arkansas a hospital owes no duty to care for, admit, or treat individuals who are not obviously seriously injured.

"C. Plaintiff has failed to establish by any competent evidence that any act of the emergency room personnel was a proximate cause of the death of Carlos Carr.

"D. Plaintiff has failed to establish what standard of care existed in

Fayetteville, Arkansas, or any basis to compare the existing standard with the conduct of the Washington Regional Medical Center Personnel.

"E. The instructions given by the court to the jury were not in accordance with the law.

"F. The verdict as returned by the jury is excessive.

"G. The court erred in allowing testimony as to changes in hospital procedures subsequent to the death of Carlos Carr."

The plaintiff denies each and every allegation in defendant's motion. In her argument she referred to the evidence and applicable law and contends that the motion of defendant is without merit and should be overruled.

It is not necessary to consider contentions A, B, C and D separately. A consideration of the entire evidence in connection with the applicable law clearly leads to the conclusion that there were and are disputed questions of fact required to be decided by the jury.

The defendant in support of these contentions argues that plaintiff failed to prove any negligence on the part of the emergency room personnel, and it relies upon the presumption that the defendant was not negligent and that the burden is on the party asserting negligence to establish the fact by a preponderance of the evidence.

The evidence clearly discloses that prior to going to the hospital in the early evening of January 8, 1972, the plaintiff called the hospital to ascertain if there was a doctor present and was advised that a doctor was available. At that time the emergency room personnel consisted of one LPN, Ruth Roberts, now Ruth Elizabeth Nail, and two orderlies, Ronald Paul Fowler and James Kenneth Nail. The nurse and Mr. Nail were sweethearts at that time and later married. After the arrival of plaintiff and the decedent, the vital signs of decedent, including blood pressure, heart rate, temperature and respiration, were tak-en by one of the orderlies who conveyed the information to the other orderly to put in the record. The nurse in charge was a LPN and was not in the room when the orderlies were taking the vital signs. She conferred for a very short time with the orderlies, and in accordance with the request of the deceased, she called on the telephone for the regular physician of the decedent and was told that he was out of the city and would not return until the following Monday. The nurse testified that she offered to call the doctor who was on call from the hospital but the decedent said that he would wait until his own doctor returned to the city. However, the plaintiff testified that she and the decedent demanded that any available doctor be called, but that the nurse failed to call anyone after having been unable to communicate with the decedent's regular physician. At that time the nurse was aware of the physical condition of the decedent and that he was suffering from severe abdominal pains and had vomited prior to entering the hospital. The nurse and the orderlies all realized that the decedent was in pain and in need of relief, but relief was not afforded.

After the plaintiff and decedent returned to their home, the pains did not subside but grew worse and plaintiff again called the hospital and an ambulance was sent to convey plaintiff and decedent back to the hospital. The testimony did not disclose the exact time he was returned to the hospital. Dr. John Vinzant, the coroner of Washington County, was called, but the evidence did not disclose who called him, but he testified that the decedent had not been dead an hour before he saw him and that the body was still warm.

The emergency room personnel testified that the decedent's vital signs were normal, but they also testified that the record of the examination of the vital signs was destroyed that night and were not seen by anyone other than the two orderlies, the nurse, and possibly Dr.

Vinzant. No explanation was given of what the orderlies and the LPN considered were normal.

The personnel were all close friends, and at the time of this incident the nurse and one of the orderlies were engaged to be married which was later consummated. A question of fact was raised by the testimony of the plaintiff and the testimony of the two orderlies and the nurse as to just what did occur, and this, among other questions, was submitted to the jury for its decision.

■ The defendant argues that under the laws of the State of Arkansas a hospital owes no duty to care for, admit, or treat individuals who are not obviously seriously injured, and that since the deceased was not bleeding, had received no injury to his person, and did not appear to be seriously ill, that the hospital did not owe him any duty to care for, admit, or treat him. But defendant concedes that the circumstances determine whether the hospital owes the duty to a person who presents himself for examination and treatment and that since he was complaining only of pain in the lower abdomen that he was obviously "not seriously" injured, and that, therefore, the hospital did not owe him the same duty that it would owe if the individual had an arm or leg amputated and was bleeding profusely from a limb. The evidence established beyond doubt that the emergency room personnel knew that the decedent was suffering pains in his abdomen. He had complained of severe pains, vomiting and had a medical history of diabetes. Such testimony clearly raised the question of whether the decedent received the attention from the hospital that his physical condition reasonably required and this was answered by the jury.

■■ The defendant further argues that the plaintiff failed to establish by any competent evidence that any act (or omission) of the emergency room personnel was a proximate cause of the death of Carlos Carr. The court submitted this question to the jury in instruction No. 12, in which the jury was told that even though it might find that the hospital failed to exercise the care, skill and diligence required as set forth in other instructions, and that such failure amounted to negligence, "yet before the plaintiff is entitled to recover for the death of the deceased, you must further find that the negligence of the hospital was a proximate cause of the subsequent death of the deceased. Under the law the plaintiff is not required to show to a mathematical certainty or to the exclusion of every other hypotheses that Carlos Carr's death occurred as a result of the negligence of which the plaintiff complains, but you, as a jury, cannot speculate or conjecture on the cause of the death, and the burden is upon the plaintiff to establish by a preponderance of the evidence that the employees of the hospital in charge of the emergency room failed to exercise the ordinary care, skill and diligence which are customarily exercised by hospitals in the community or similar communities under similar conditions, and that such failure on the part of such employees was a proximate cause of the subsequent death of the deceased."

In this connection Dr. Robert McCollum, the regular physician of the deceased, testified that he could not predict the time of death of any living individual, but he, together with Dr. Vinzant, testified that any individual's chances of survival would be increased if he saw a doctor.

Dr. McCollum, in speaking of the deceased, said:

A. * * * I had him as a private patient from 1967 through 1971.

Q. What was the purpose of his first visit to your office?

A. Check on his diabetes.

Q. What was the condition of his diabetes?

A. It was poorly controlled, the diabetes at this time.

Q. Did his diabetic condition ever become stable?

A. Symtomatically he was stable most of the time I treated him for sugar, rather unstable all through the time I saw him.

Q. Did you have occasion to treat Carlos Carr and when did you treat him since his first visit in 1967?

A. I saw him on numerous occasions through the next few years, primarily for his diabetes until 1971, in July. I saw him for a diabetic check and found him to be hypertensive for the first time on this visit.

Q. What did you do about this hypertension?

A. I started him on anti-hypertension medication which controlled it and remained under control throughout the remainder of his visits.

Q. When was the last time you saw Carlos?

A. The last time I actually saw him as a patient was 11–15–71. He was in the office one time after that just for a blood sugar which the nurse drew.

Q. You mean hypertension and sugar check, are these two separate illnesses?

A. Two separate illnesses. We checked them at the same time. The last check for hypertension was—the last time I saw him was 11–15–71.

Q. At that time it was under good control?

A. Yes, pressure was 140 over 80.

Q. Did you ever have any indication that Carlos Carr might have been suffering from any cardiac problem?

A. He never presented any symptoms of physical findings to my knowledge other than his hypertension.

Dr. Vinzant prepared the death certificate and stated: "From the history it was an acute myocardial infarction, arteriosclerosis secondary to diabetes."

He based his opinion on symptoms described by the emergency room personnel and on consultation with Dr. McCollum regarding the deceased's history and in part on the emergency room report which was filled out by the nurse on duty. This report relative to the vital signs was destroyed and was not available for inspection by any doctor after Dr. Vinzant had filled out the death certificate.

It is undisputed that the decedent went to the hospital complaining of severe abdominal pains and had been vomiting. Dr. McCollum testified that in his opinion a medical emergency existed at that time and a physician should have been called to examine the patient. In answer to a hypothetical question, the doctor testified that assuming that the patient died within a very few hours after he was released, that the chance of survival would have been increased or enhanced had he been examined by a physician.

A consideration of the testimony of Dr. McCollum who had a complete knowledge of the physical and mental condition of the deceased, coupled with the testimony of Dr. Vinzant based upon information obtained from the emergency room employees and the record prior to its destruction, the court believes that there was a substantial medical possibility of survival which was destroyed by the defendant's inattention and lack of care, and under these circumstances the plaintiff is not required to show to a certainty that the deceased would have lived had he been hospitalized or had a doctor been called.

The defendant in support of its contention that the plaintiff failed to establish what standard of care existed in Fayetteville, Ark., or any basis to compare the existing standard with the conduct of the hospital in this instance argues that the issue is not whether the nurse refused to call a doctor when requested, but whether the nurse abused her discretion in determining what was a medical emergency; that the nurse at the time had discretion in determining

what is a medical emergency and what is not. The defendant also argues:

"All of the individuals from the medical profession that testified at the trial indicated that there are some instances where individuals report to the emergency room for matters which are not emergencies, but which for some reason the individual feels the necessity of going to the emergency room as opposed to the doctor's office. One of the reasons given for this was that there is an appreciable smaller waiting period at the emergency room than there is in a doctor's office. Because these individuals report to the emergency room for treatment which is not a medical emergency, the emergency room nurse is vested with broad discretion in determining what is a medical emergency and when a doctor should be called."

It is undisputed that the deceased was suffering much pain. The nurse and the orderlies were fully advised of his then condition, and under the circumstances disclosed by the evidence it is clear that a medical emergency existed. The facts appear so plainly that it was not necessary to introduce further expert testimony other than the testimony of Doctors McCollum and Vinzant.

The law requires the hospital is duty bound to furnish the care and attention reasonably required by the physical condition of the patient. It is inconceivable that a defendant can escape liability by asserting that it rendered the same care as would have been rendered at any other hospital in the immediate area. The jury evidently found that the hospital was negligent and under the facts and circumstances it was unnecessary for plaintiff to introduce further testimony that the deceased would have received no better or more attention in other hospitals than he received from the personnel in the emergency room.

In contention E defendant complains that the court erred in giving instruction No. 11 dealing with the standard of care of a hospital. It contends that the standard of care as stated therein by the court indicates a "malpractice standard of care applicable to hospitals which is generally applicable to physicians, surgeons and dentists," and "that standard of care, however, is a higher standard of care than is required of hospitals in the State of Arkansas." The defendant set forth what it contends is the pertinent part of Arkansas Model Jury Instruction No. 1505, 2d Ed., as follows:

"A hospital must use ordinary care to furnish a patient the care and attention reasonably required by his mental and physical condition."

The instruction which the court gave is as follows:

"If a hospital undertakes to perform a service to a person in the emergency room, it must give such person such reasonable care and attention as his known condition requires and exercise the ordinary care, skill and diligence which is customarily exercised by hospitals generally in the community or similar communities under similar conditions.

"In determining whether the hospital was guilty of negligence, you should consider all of the evidence in the case and the known conditions that existed at the time, and if you find that the hospital through its agents, servants, and employees failed to exercise the degree of care, skill and diligence above referred to, such failure would be negligence."

It will be noted that the instruction given does not require any more care and attention than that the patient be furnished the care and attention reasonably required by his mental and physical condition. It does not refer to the standard of care required by law on claims made against physicians or surgeons, but only to the service required to be rendered by the employees of the emergency room.

In contention F the defendant contends that the verdict as returned by the jury is excessive. An examination of the evidence refutes this contention. The awards made to the widow of the deceased and to his minor children are very reasonable under the evidence. The jury was told what items it should consider and the awards were made only on the items that were fully established by the evidence. The amount awarded to the widow for pecuniary damages, mental anguish and loss of consortium were minimal when compared with other verdicts, and the same may be said of the amount awarded to the two minor children when the evidence of the contribution that they had a right to expect of their father was considered, to say nothing of the mental anguish and loss of training which they undoubtedly would have received from their father had he continued to live.

In contention G the defendant contends that the court erred in allowing testimony as to changes in hospital procedures subsequent to the death of Carlos Carr. The objection is based on the evidence which discloses that the emergency room employees destroyed the record after he had died. The defendant contends that the testimony should not have been admitted since it implies that the hospital changed its procedure as a result of the incident after Carlos Carr died. The court does not know why the record was destroyed, but does know that the plaintiff was greatly hampered in proving just what was done by the employees and what their examination disclosed, and the jury had a right to consider the effect that such destruction had in determining the actual facts. It seems highly unreasonable that the findings of the physical condition of a person examined by the emergency room employees would be destroyed. No one knows the effect that such action had on the jury, but the jury certainly had a right to infer that the record had it been retained would have shown that a medical emergency existed and that a doctor should have been called and that more attention should have been given him than was given.

The court is convinced that the facts and circumstances and evidence are substantial when considered in the light most favorable to the plaintiff and are ample under the applicable law to sustain the verdict.

Therefore, the defendant's motion for judgment notwithstanding the verdict should be overruled.

The motion in the alternative for a new trial has been considered, and the court finds that since no material error was committed during the trial that the same should be denied.

Judgment in accordance with the above is being entered today.