Mrs. Floy Fordham LEWIS

v.

DARCE TOWING CO., INC.

No. 80–0655.

United States District Court,
W. D. Louisiana,
Lake Charles Division.

April 14, 1982.

Ruling on Plaintiff's Motion
for Reconsideration June 18, 1982.

* The government has not filed an opposition to plaintiffs' motion.

## MEMORANDUM RULING ON DEFENDANT'S MOTION TO EXCLUDE EVIDENCE

VERON, District Judge.

On March 22, 1982, the defendant, Darce Towing Co., Inc., filed a motion in the above captioned matter to exclude all expert testimony at trial which was derived from an ex parte autopsy of the plaintiff's decedent. The motion was heard by the court at an expedited hearing on March 26, 1982. Having had the benefit of oral argument and the memoranda submitted by the parties, the court is now called upon to rule. Before doing so, however, it is important to set out a chronology of significant events.

On August 27, 1979, the decedent was employed by the defendant as an assistant engineer and a member of the crew of the M/V CAPTAIN GENTRY located approximately fifty miles offshore in the Gulf of Mexico. It is alleged by the plaintiff that on this particular date the decedent slipped and fell due to the negligence of the defendant and unseaworthiness of the vessel. The following day the decedent was flown ashore and hospitalized at St. Francis Cabrini Hospital in Alexandria, Louisiana.

Decedent was discharged on September 1, 1979, and returned home where he expired while asleep during the early morning hours of September 3, 1979. A death certificate issued by the Coroner indicated that a heart attack was the cause of death. The decedent was subsequently buried in Alexandria.

On April 25, 1980, decedent's widow filed this suit and on June 16, 1980, defendant filed its answer together with a set of interrogatories pertaining to both the decedent and the plaintiff. One of those interrogatories requested *"copies of all* your/*decedent's medical data,* be it reports, reports of x-rays, reports of surgery, etc., *in any way related to* your alleged condition and *decedent's death."* Another requested *"any and all statements, be they recorded, oral, written, transcribed or of any other nature,* which are in your possession or the possession of your attorneys *that bear any rela-*

William B. Baggett and Drew Ranier, Baggett, McCall, Singleton & Ranier, Lake Charles, La., for plaintiff.

Ashton R. O'Dwyer, Jr., and Miles P. Clements, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., for defendant.

*tion to the captioned litigation."* (Emphasis added)

During November, 1980, the plaintiff contacted and subsequently retained Dr. George McCormick, a forensic pathologist, to perform an autopsy of the decedent and render an opinion as to the cause of his death. Plaintiff did not provide the defendant with notice of either the retention of Dr. McCormick or the intention to perform the autopsy.

Thereafter, arrangements were made by the plaintiff's attorney for the decedent's body to be exhumed in Alexandria and transferred to Bossier City where Dr. McCormick performed an autopsy on January 29, 1981. During the course of the autopsy, Dr. McCormick recorded his observations on a continuous belt dictation system as he removed and dissected all of the major organs of the decedent's body. He retained certain "trimmings" and small sections of the organs with which he made slides, and destroyed the remaining sections of the organs by incineration. Dr. McCormick also took six photographs during the autopsy.

On February 4, 1981, six days after the autopsy was performed, defendant's counsel deposed the plaintiff, Mrs. Floy Fordham Lewis, in the presence of her attorney. At the deposition, the following colloquy took place:

Q. After your husband died, when and where was he buried?

A. He was buried in Alexandria Memorial Gardens on September 4, the day after he died.

Q. Was there an autopsy?

A. No, the doctor never saw him when he died.

Q. Did any doctor see him after he expired until he was buried?

A. No.

Q. When was the last time a doctor had seen him? Would that have been the hospital?

A. When he was discharged that Saturday, Dr. Banks discharged him from the hospital. Dr. Weiss was also his partner. Dr. Banks discharged him.

There was no mention by either the plaintiff or her attorney of the January 29 autopsy.

Plaintiff's counsel finally notified the defendant that an autopsy had been performed on June 23, 1981. This notification came after plaintiff's counsel obtained information from Dr. McCormick that the results would be favorable to the plaintiff's case. The matter of the autopsy was brought to the court's attention on June 26, 1981, at which time the court ordered the body of the decedent re-exhumed for inspection by defendant's expert. As of this date the body has not been re-exhumed, presumably because no organs remain to inspect and because defendant's expert opined that nothing would be accomplished by going over the ground again. The court further ordered plaintiff's counsel to furnish the defendant with a copy of Dr. McCormick's report and upset the trial date of July 20, 1981.

On August 10, 1981, the defendant filed a motion seeking production of (1) Dr. McCormick's opinions and conclusions; (2) his notes, remarks, comments and memoranda; and (3) the autopsy protocol, all of which were rendered in connection with his examination of the decedent. In addition, the defendant requested "reports of findings, conclusions, and opinions of any expert witness retained by the plaintiff, her agents, attorneys or representative in connection with this litigation."

Plaintiff responded to defendant's request for production on October 1, 1981. From that response, defendant learned that Dr. McCormick had in his possession certain wet tissue, microscopic slides and an autopsy protocol (also referred to as an autopsy report), but that no other recorded data regarding the autopsy had been retained. In fact, plaintiff stated that "the autopsy protocol or report was taken from dictation on a continuous belt dictation system and the *actual dictation has been erased."* (Emphasis added) In addition, the defendant learned that the protocol (report), the microscopic slides and the wet tissue would be

made available to the defendant at his pathologist's request.

Meanwhile, Dr. McCormick's conclusions had become available in mid-September, 1981. Dr. McCormick concluded as follows:

This subject sustained a minor back injury in a fall from a ladder to the deck of a boat, and was hospitalized. Although he had several previous back injuries, this one did not seem severe enough for surgical management, and he was released after several days in the hospital. He died quite suddenly his first night home, and the death was found to be due to bilateral pulmonary emboli. These emboli apparently had formed as thrombi in the venous system (deep leg veins?) during his hospitalization for the back injury, and were mobilized into emboli when he was moved home. Thus, the death was indirectly casually related to the minor injury.

This conclusion was defendant's first official notice that the decedent's death may have been caused by something other than the heart attack listed in the death certificate.

Thereafter, Dr. Monroe Samuels was retained by the defendant for the purpose of examining the autopsy slides prepared by Dr. McCormick to render an opinion as to the cause of death. Based on Dr. McCormick's report and the autopsy slides, Dr. Samuels confidently attributed the decedent's death to arteriosclerotic heart disease. Contrary to Dr. McCormick, Dr. Samuels, in his deposition of January 6, 1982, opined that the blood clot in the decedent's pulmonary artery was post-mortem (rather than ante-mortem) and that it had nothing whatsoever to do with the decedent's death.

Finally, on March 2, 1982, the defendant deposed plaintiff's expert, Dr. McCormick. In that deposition the defendant learned that Dr. McCormick had in his possession a transcription of the spontaneous observations he had made and recorded during the autopsy. In addition, the defendant learned that Dr. McCormick took six photographs of the decedent during the autopsy and also had in his possession a written report from Dr. Francisco, another forensic pathologist, dated August 26, 1981. While the defendant was able to view Dr. McCormick's autopsy pictures at the deposition, as of this date the defendant has not received copies of those pictures. Neither has the defendant received either the original or a transcribed copy of Dr. McCormick's spontaneous observations recorded during the autopsy.

In reaching a decision in this matter, the court must consider three issues—(1) the courts power to impose sanctions for a party's failure to comply with the discovery provisions of the Federal Rules of Civil Procedure; (2) whether there was a breach of duty in this case and whether sanctions are appropriate under the circumstances; and (3) the appropriate sanction to be applied in cases where one party performs an ex parte autopsy without notice to the other party.

## I. COURTS POWER TO IMPOSE SANCTIONS

Little time need be spent with the first issue. Pursuant to FRCP 37, the court is authorized to impose sanctions against a party for failure to make discovery. Rule 37(b)(2)(B) specifically authorizes the exclusion of evidence where a party fails to comply with a court order regarding discovery. However, even where no specific court order is involved, the district court has broad discretion to render discovery and evidentiary rulings necessary to ensure a fair and orderly trial. See, e.g., *Phil Crowley Steel Corporation v. Macomber, Inc.*, 601 F.2d 342 (8th Cir. 1979); *Halverson v. Campbell Soup Co.*, 374 F.2d 810, 812 (7th Cir. 1967); *Clark v. Pennsylvania R.R. Co.*, 328 F.2d 591, 594–95 (2d Cir.), cert. denied, 377 U.S. 1006, 84 S.Ct. 1943, 12 L.Ed.2d 1054 (1964); 8 Wright & Miller, *Federal Practice & Procedure*, § 2050 (1970). Such broad discretion is reasonable, for without it, the court would be powerless to deal with discovery violations, no matter how flagrant, that do not specifically involve a court order.

This case is one that does not involve a court order. What is involved is the duty of the parties, absent a court order, to seasonably amend discovery responses. Rule 26(e) governs that duty and provides in pertinent part as follows:

A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which (A) he knows that the response was incorrect when made, or (B) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

Although the rule does not contain a specific sanction for failure to supplement discovery, "[f]ew would question a court's inherent power to discipline breaches of [the rule], even in the absence of a court order." *Campbell Industries vs. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980). Having concluded that the court has the power to discipline breaches of the discovery process even in the absence of a court order, the court must now determine whether any breaches occurred in this case.

## II. BREACH OF DUTY

■ The facts are uncontroverted that as early as April 25, 1980, the defendant propounded interrogatories upon the plaintiff designed to discover the existence of any reports which were in any way related to the decedent's death. Defendant, however, was never notified of plaintiff's intent to perform an autopsy nor of the autopsy itself until approximately five months after it was performed. Neither did the plaintiff provide the defendant with a copy of Dr. Francisco's report, dated August 26, 1981, until after Dr. McCormick's deposition on March 2, 1982—fully six months after it was written and several months after Dr. Samuels' deposition.

In addition, it is not disputed that neither the plaintiff nor her attorney mentioned the autopsy during plaintiff's deposition on February 4, 1981—even though it had been arranged six days earlier by the plaintiff's attorney and even though both the exhumation and the autopsy specifically required the plaintiff's consent. Although the argument has been made that no concealment took place because defendant's questions addressed themselves only to whether any autopsy had been performed immediately after death, it is clear to the court what information the defendant was seeking. Despite this opportunity to supplement responses, the defendant received no notice of the autopsy until a full five months later.

Finally, contrary to the plaintiff's representations of October 1, 1981 that no recorded data regarding the autopsy had been retained, the fact is that plaintiff's expert did have in his possession a transcription of observations made and recorded during the autopsy. The defendant did not learn this information until Dr. McCormick's deposition on March 2, 1982—fully five months after plaintiff's misrepresentation. Neither did the defendant learn of the existence of any autopsy photographs until March 2, 1982—fully thirteen months after they had been taken.

These facts indicate to the court that the plaintiff violated her duty to seasonably apprise the defendant of newly acquired information under circumstances that indicate willful and knowing concealment. Thus, the court has no difficulty in concluding that disciplinary measures are in order. The next task is to determine what sanction would be appropriate under the circumstances of this case.

## III. THE APPROPRIATE SANCTION

■ According to the Advisory Committee Note to Rule 26(e), the trial court has the discretion to exclude evidence, grant a continuance, or take any other action it may deem appropriate where the duty to supplement has been breached. See *Murphy v. Magnolia Electric Power Ass'n.*, 639 F.2d 232 (5th Cir. 1981). In this case, defendant's motion requests the court to exclude all evidence derived from the autopsy.

After a review of the applicable case law, the court has determined that there are five factors to consider before deciding whether the evidence should be excluded. These

include: (1) whether the defendant was prejudiced as a result of the ex parte autopsy; (2) whether the prejudice can be cured; (3) the practical importance of the evidence; (4) whether the plaintiff was in good or bad faith; and (5) the potential for abuse if the evidence is not excluded. See, e.g., *Murphy v. Magnolia Electric Power Ass'n.*, supra; *DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193 (3rd Cir. 1978); *Meyers v. Pennypack Woods*, 559 F.2d 894 (3rd Cir. 1977).

### 1. The Question of Prejudice

As regards the issue of prejudice, the defendant argues that the ex parte autopsy has provided the plaintiff with an unfair advantage in the litigation. It is argued that this advantage stems from the fact that the defendant was deprived of the opportunity to view the decedent's external and internal appearances both prior to and during the autopsy, as well as deprived of the opportunity to observe, test and dissect tissue while intact. On the other hand, the plaintiff argues that no actual prejudice has taken place for the reason that defendant's expert, after reviewing plaintiff's slides, was able to render an opinion contrary to plaintiff's expert. Thus, plaintiff reasons, the stage is set for the classic confrontation between experts as to the cause of death, and because of this, the defendant has suffered no prejudice.

Plaintiff's reasoning misses the point. Certainly if the experts were in agreement as to the cause of death, the defendant could not so easily be heard to argue that he had suffered prejudice. However, the very fact that there is a disagreement indicates to the court that the defendant may have suffered some prejudice. The prejudice which the court finds arises for several reasons.

First, through no fault of his own, the defendant has been placed in the compromised position of having to prepare a defense based on limited access to the work product of the plaintiff's retained expert. Since the plaintiff has not provided the defendant with either Dr. McCormick's original oral dictation or his transcribed notes, Dr. Samuels' opinion is entirely dependent upon the observations listed by Dr. McCormick in his report (written eight months after the autopsy), several photographs of limited areas, nineteen slides (ten of which were prepared in support of Dr. McCormick's opinion concerning pre-mortem emboli) and certain "trimmings" or selected tissues retained by Dr. McCormick. Inasmuch as the scope of Dr. Samuels' examination has been restricted to the aforementioned work product and the subjective observations made by Dr. McCormick, the defendant has been effectively precluded from investigating other potential causes of the decedent's death. While the court does not mean to denigrate the quality of Dr. McCormick's work, there is no safeguard that he covered all possible bases in his examination. Because Dr. Samuels was not present at the autopsy, his opinion is only speculative as to those items not referred to in the report—that could very well have been the cause of death. For instance, Dr. Samuels ruled out a myocardial infarction on grounds that the autopsy report did not reflect a description of the type of changes in the heart tissue which occur when one suffers an infarct. However, it cannot be concluded with any certainty that these changes were not in fact present during the autopsy. All that can be concluded is that any such changes do not appear in Dr. McCormick's report nor in the slides taken. The point is that Dr. Samuels must make certain assumptions when something is not noted in the report, without the knowledge of why it was not noted.

Secondly, the court is concerned that the defendant may have suffered prejudice because of the difficulty defendant's counsel will experience in effectively presenting Dr. Samuels' opinions and conclusions and in cross examining Dr. McCormick. It is apparent to the court, after having read the depositions of both doctors, that Dr. McCormick, having been the only one present at the autopsy, is the only one who can testify as to what he actually saw during the autopsy and what he actually meant in the autopsy report. In other words, Dr. McCor-

mick is in a position to impeach Dr. Samuels' understanding of what is actually contained in the autopsy report. Since Dr. Samuels' ultimate opinion is based on his reading of the autopsy report, to permit Dr. McCormick to testify, as he did in his deposition, that Dr. Samuels misread the report, would be to undermine Dr. Samuels and give the plaintiff a definite advantage over the defendant in front of the jury. Simply put, the defendant does not enjoy equal footing with the plaintiff as regards expert testimony.

In summary, the court finds that the defendant has suffered prejudice because he was deprived of the opportunity to participate in the autopsy and thus deprived of the opportunity to examine whether there may have been other medical explanations for the decedent's death—explanations other than pre-mortem pulmonary emboli or arteriosclerotic heart disease. In addition, the court finds that the defendant will suffer prejudice if Dr. McCormick is permitted to testify because as the creator of the work product which forms the foundation for the ultimate opinions concerning causation, Dr. McCormick is in a position to describe findings not mentioned in the report, as well as in a position to impeach Dr. Samuels' opinion on grounds that he misread Dr. McCormick's report.

## 2. Whether Prejudice Can Be Cured

Since the court has found that prejudice exists, the next question that must be answered is whether that prejudice can be cured. After careful thought, the court finds that the unfair trial advantage enjoyed by plaintiff may be cured, in part, by refusing to permit Dr. McCormick's testimony at trial. By ordering that expert testimony in this case be restricted to Dr. Francisco and Dr. Samuels, both of whom have had the same limited access to Dr. McCormick's work product, perhaps the court can place the parties back into a position of relative equipoise without having to exclude the evidence.

In addition, by ordering that Dr. McCormick's original oral dictation be made available to both Dr. Francisco and Dr. Samuels, perhaps some of the open questions raised by the lack of certain observations in the written autopsy report would be cleared up. The court is not sure however, that such an order would be sufficient to alleviate the prejudice caused by the defendant's lack of opportunity to independently observe, dissect and test tissue while intact and raise other issues as to the cause of death. Nor is there an alternative means of curing that particular prejudice. Dr. McCormick did not photographically preserve what he viewed during the autopsy (except for limited pictures of the lumbar spine), and with the exception of selected tissues, most of the decedent's internal organs have now been incinerated. Thus, while production of the original tapes may clear up many questions posed by the defendant, the court cannot rule with any certainty that such an order would cure all the prejudice.

## 3. Practical Importance of the Evidence

Inasmuch as the court is presently unable to determine with certainty that it can cure all the prejudice, it must now weigh the practical importance of the evidence at trial against the degree of prejudice it may cause. If the evidence derived from the autopsy was not of any significant consequence, the court would have no difficulty excluding it at this stage of the analysis. It is clear, however, that the evidence may be of significant probative value, especially in light of the fact that it has raised a dispute between experts as to the cause of death. The court is also aware of the value of the evidence to the parties—without it there seems to be little else to link the decedent's death with his alleged fall on the defendant's vessel.

Considering, without more, the fact that the evidence is probative as to the cause of death (and therefore a factor in the outcome of the case) and the fact that most of the defendant's alleged prejudice can be cured by ordering production of the original autopsy tapes and excluding Dr. McCormick's testimony at trial, the court would be inclined to deny defendant's motion to

269

exclude. However, considering all the circumstances under which this unfortunate situation developed, the court, in the final analysis, is inclined to grant defendant's motion. In doing so, the court places heavy emphasis on (1) the failure of both the plaintiff and her attorney to notify the defendant of the decedent's autopsy, and (2) the potential for abuse that would exist if such evidence is not excluded.

### 4. Good or Bad Faith

As stated earlier, the facts of this case indicate that the plaintiff violated her duty to seasonably apprise the defendant of newly acquired information under circumstances that indicate willful and knowing concealment. The plaintiff failed to mention the January 29 autopsy at her February 4 deposition, despite questions designed to learn of the existence of an autopsy and despite the fact that her permission was necessary for the exhumation as well as for the autopsy to be performed. Information concerning the autopsy was passed on to the defendant only after plaintiff's counsel became aware that the results were favorable to the plaintiff's case. Under the circumstances the court can only conclude that the plaintiff acted in bad faith.

### 5. Potential For Abuse

The final consideration—one that has given the court great pause, but also one that needs no long discourse—concerns the potential for abuse that would exist if evidence obtained on an ex parte basis by a retained expert is not excluded. The court is of the opinion that by not excluding evidence so obtained, the court would be condoning discovery tactics ripe with potential abuse. For example, at the extreme end of the spectrum, autopsies that yield no favorable results for the conducting party could be conveniently forgotten, especially if the results proved favorable to the opposition. The potential for collusion between the parties and their experts is legion and the court refuses to lend its hand to the damaging effect such collusion could have on the integrity of the judicial process.

Therefor, the court concludes that where evidence is obtained from an ex parte autopsy performed by an expert retained for the purposes of litigation without notice to the adverse party, the evidence is open to question and should be excluded at trial.

The court does not stand alone in its conclusion. In a case with facts remarkably similar to this, the United States District Court for the Western District of Oklahoma excluded all evidence of the autopsy. *Barker v. Bledsoe*, 85 F.R.D. 545 (W.D.Okla. 1979). In doing so the court stated:

> Our modern jurisprudence no longer fosters "trial by ambush." All parties are free to invoke the protection of this and other courts to protect their rights. However, this privilege carries a concomitant responsibility of fairness, both to the Court and the adverse party, in prosecuting one's suit. The requirement of due process is not an ephemeral concept, confined to the criminal arena, but extends to all litigants the standard of fundamental fairness in federal court. When an expert employed by a party or his attorney conducts an examination reasonably foreseeably destructive without notice to opposing counsel and such examination results in either negligent or intentional destruction of evidence, thereby rendering it impossible for an opposing party to obtain a fair trial, it appears that the Court would be not only empowered, but required to take appropriate action, either to dismiss the suit altogether, or to ameliorate the ill-gotten advantage. A presumption as to certain evidence is simply not sufficient to protect against such conduct. *Barker*, supra, at 547–48.

## IV. CONCLUSION

While the evidence derived from the autopsy may be of significant probative value, the court holds that other competing interests require that it be excluded at trial. In so holding, the court emphasizes the fact that it is unable to ensure that the defendant will not suffer some prejudice if the evidence is admitted. In addition, the court places great stress on plaintiff's knowing

concealment of the autopsy, as well as the potential for abuse that will exist if the court condones such discovery tactics.

Accordingly, defendant's motion to exclude all evidence of the autopsy should be, and hereby is, GRANTED.

## RULING ON PLAINTIFF'S MOTION FOR RECONSIDERATION

Plaintiff filed this motion requesting a new trial and/or rehearing in the above captioned matter on April 26, 1982. The court granted plaintiff's request for a rehearing and oral argument was held on May 17, 1982. Having carefully considered the arguments of counsel and reviewed the memoranda submitted by the parties, the court is now ready to rule.

Plaintiff's motion urges the court to reconsider its April 14, 1982 ruling excluding any evidence at trial which was obtained from an ex parte autopsy performed, without notice to the defendant, by plaintiff's retained expert. Plaintiff alleges that three reasons support the motion to reconsider, to-wit: (1) there are factual errors in the ruling excluding the evidence; (2) the court has elevated the issue of the autopsy out of the context of the discovery process of the case as a whole; and (3) the present case is distinguishable from the authorities relied on by the court.

### FACTUAL ERRORS

Following the original hearing in this matter the court concluded that under the facts presented the plaintiff had violated her duty to seasonably apprise the defendant of newly acquired information under circumstances indicating willful and knowing concealment, and that because of this, disciplinary measures were in order. On rehearing plaintiff contends that the court misconstrued the facts presented and that there was no "unseasonable failure" on plaintiff's part that would indicate "knowing" concealment. Specifically, plaintiff contends that the court's ruling relied on plaintiff's alleged delays in making availa-

ble Dr. Francisco's report, Dr. McCormick's report, the knowledge of transcription and the photographs of the autopsy; and that this reliance was misplaced inasmuch as those items were made available to the defendant at virtually the same time they became available to the plaintiff. Thus, plaintiff asserts that the court's conclusion that there was knowing concealment on the plaintiff's part is unsupported by the facts.

The court wishes to set the record straight in this matter and the Memorandum Ruling of April 14, 1982 is hereby amended to reflect the factual representations made by the plaintiff on rehearing. However, after careful consideration of the amended factual setting the court stands by its original conclusion. The undisputed critical facts which remain are (1) that the defendant was not provided with advance notice of the scheduled autopsy; (2) that the existence of the autopsy was not disclosed during plaintiff's deposition on February 4, 1981, even though it had been arranged by plaintiff's attorney and performed only six days earlier by plaintiff's expert and even though both the exhumation and the autopsy specifically required the plaintiff's consent; and (3) that the existence of the autopsy was not revealed until plaintiff's counsel was informed by Dr. McCormick that the autopsy was favorable to plaintiff's case.

When these facts are considered in light of the defendant's obvious interest in the results of an autopsy performed at any time (after all, the autopsy evidence is critical in establishing a wrongful death claim and refuting the coroner's death certificate), and then viewed in light of the autopsy probing questions propounded by defendant's counsel at plaintiff's deposition, it is clear to the court that knowing concealment took place.

In addition, plaintiff contends that the evidence is insufficient to support the court's conclusion that the defendant was prejudiced because Dr. Samuels was denied the opportunity to substantiate any other

cause of death. The court disagrees. The evidence clearly establishes that in performing the autopsy, plaintiff's expert removed all of the major organs, retained certain selected trimmings and incinerated the remainder. This being the case, the court concludes that defendant's expert was put in the position of having to rely on plaintiff's experts' work product, and was therefore unable to independently pursue other causes of death. This conclusion was born out by Dr. Samuels' affidavit, submitted on rehearing, which states that he is "unable to either confirm Dr. McCormicks' findings noted in Dr. McCormick's autopsy protocol, or to determine if there are other findings overlooked by Dr. McCormick which were not noted in the autopsy protocol which may have indicated other possible causes of death."

The plaintiff conceded in oral argument and the court finds that the evidence is sufficient to support its original conclusion that the defendant suffered prejudice in not being afforded the opportunity to independently pursue other causes of death.

Plaintiff's contention that the defendant could have arranged for an autopsy if it was so interested in the results is unfounded. While certainly the defendant could have arranged such an autopsy (albeit only with the plaintiff's permission), the court notes that it is the plaintiff who bears the burden of proof in establishing a wrongful death claim. Only then does the defendant's burden to refute that claim come into existence. In this case, the defendant had no reason to go forward with an autopsy because the coroner's certificate attributed death to a heart attack. In short, plaintiff had not established anything for the defendant to refute.

Finally, plaintiff asserts that the court's contention that the plaintiff would not have informed the defendant of the existence of the autopsy had the results been negative "is illogical." Plaintiff argues that "her case could not be hurt by a negative autopsy finding, since that would place her case

in exactly the same position it was in was (sic) *before* the autopsy—unable to bear her legal burden or (sic) proving the cause of death." The court wishes to point out that it did *not* contend that plaintiff would *not* have informed the defendant of any negative autopsy findings in this particular case. The court only cited that possibility as an example of the kind of abuse that could take place if autopsy evidence obtained on an ex parte basis by a retained expert is not excluded.

Thus, while the court acknowledges that there were some factual errors in the ruling excluding the evidence, there was no error in the critical facts on which the ruling ultimately rested.

## THE DISCOVERY CONTEXT

Plaintiff's next contention is that it was unfair for the court "to single out the delays in reporting the results of the autopsy from the context of the discovery process of the case as a whole." Plaintiff then proceeds to document alleged breaches of the discovery process by the defendant.

■ First of all, the court would like to make clear once again that it did not single out the "delays" in reporting the results of the autopsy. The court's decision rested on the critical facts previously mentioned. Secondly, the injury which occurs when one party fails to apprise another of scheduled destructive testing is not one that can be avoided by the normal discovery process. For example, motions to compel are only appropriate where the parties have knowledge that certain information exists. Where, as here, one party has no knowledge of the others intent to perform an autopsy, a discovery motion cannot be brought. Thus, the failure to apprise an adverse party of scheduled destructive testing deserves to be singled out of the discovery context as a whole.

## THE LAW

Plaintiff's final contention is that the facts of this particular case are distinguish-

able from the authorities relied on by the court. Plaintiff argues that *Barker v. Bledsoe*, 85 F.R.D. 545 (W.D.Okl.1979) is only authority for excluding evidence derived from an "incompetent" autopsy and that there has been no finding in this case that the evidence is anything other than good, competent and credible. After reviewing *Barker v. Bledsoe* once again, the court notes the similarity between the facts of that case and the one at bar. The procedure utilized by Dr. Irvine in *Barker* was no more destructive than that utilized by Dr. McCormick in the present case. Body organs were removed, tissue was incinerated and meaningful photographs with visible landmarks were not taken. A further similarity is that, as in *Barker*, there was no immediate recordation of Dr. McCormick's findings. In fact, the gross examination autopsy protocol was not prepared by Dr. McCormick until approximately eight months after the autopsy itself. According to Dr. Samuels' affidavit, submitted on rehearing, such a delay is "highly irregular and contrary to accepted medical practice." Finally, there is no way the court can objectively confirm that the autopsy evidence is good, competent or credible. The above noted irregularities and extreme reluctance on the part of Dr. McCormick to release his spontaneously transcribed findings suggest otherwise.

■ Plaintiff's argument that a court may only impose sanctions where there has first been an order which has been violated is without merit. It has been established beyond peradventure that district courts have the discretion to exclude expert testimony and discipline breaches of the discovery process even in the absence of a court order. *Campbell Industries v. M/V GEMINI*, 619 F.2d 24 (9th Cir. 1980). Plaintiff cannot seriously contend that the defendant, in order to seek relief from the court in the instant case, must have previously obtained a court order in anticipation of something of which he had no knowledge. Such an argument defies logic.

Finally, the authorities cited by the plaintiff for the proposition that preclusion of the autopsy evidence is too harsh a sanction do not deal with selective destruction of evidence by one parties retained expert. In addition, the court does not agree that the facts of this case are analogous to the situation where a claimant is sent to a physician by his attorney for evaluation or surgical purposes. There is a difference between a patients submission for an evaluation or for surgery (where it is presumed that the doctor is going to undertake procedures designed to determine the problems and to help the patient) and an autopsy.

CONCLUSION

For the above and foregoing reasons, the court finds that its original ruling in this matter was correct. However, that ruling should be amended to reflect plaintiff's factual representations submitted on rehearing. In addition, that ruling should be amended to delete Ashton R. O'Dwyer as counsel of record for the defendant, Darce Towing Co., Inc. Finally, since this ruling, as amended, involves a controlling question of law as to which there are substantial grounds for difference of opinion, and an immediate appeal from this ruling may materially advance the ultimate termination of this litigation, it is hereby ORDERED that for purposes of computing the time within which an appeal must be filed pursuant to 28 U.S.C. § 1292(b), the ruling entered April 14, 1982, as amended in this ruling, shall be deemed entered as of the date of this ruling.