MARY E. SCHINDLER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF GERALD R. SCHINDLER, DECEASED, APPELLANT AND CROSS-APPELLEE, V. RICHARD WALKER, M.D., APPELLEE AND CROSS-APPELLANT, AND DOUGLAS M. MONASEBIAN, M.D., ET AL., APPELLEES.

582 N.W. 2d 369

Filed July 7, 1998.    No. A-97-073.

Daniel B. Cullan and Paul W. Madgett, of Cullan & Cullan, for appellant.

John P. Mullen and Lisa M. Meyer, of Gaines, Mullen, Pansing & Hogan, for appellees University of Nebraska Medical Center and Monasebian.

Joseph F. Bataillon and Kelly K. Brandon, of Sodoro, Daly & Sodoro, for appellee Walker.

William M. Lamson, Jr., and William R. Settles, of Kennedy Holland DeLacy & Svoboda, for appellee Patil.

HANNON, IRWIN, and INBODY, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Mary E. Schindler, individually and as personal representative of the estate of Gerald R. Schindler, deceased, appeals from portions of the judgment rendered by the district court against her and in favor of the University of Nebraska Medical Center (UNMC) and Douglas M. Monasebian, M.D., and from verdicts rendered by a jury against her and in favor of Richard Walker, M.D., and Arun Angelo Patil, M.D., in this wrongful death action. On appeal, Schindler alleges that the district court erred in not removing various potential jurors from the jury pool, in disallowing testimony concerning an autopsy, in failing to give a requested instruction to the jury concerning missing x rays, and in denying her motion for new trial. Finding no merit to any of Schindler's claims, we affirm.

UNMC has argued a cross-appeal challenging a portion of the judgment rendered by the district court in favor of Schindler and against UNMC in the amount of $15,000 on Schindler's allegation of negligent infliction of emotional distress. Because we conclude that UNMC has not properly raised this issue as a cross-appeal, we affirm the district court's judgment. Finally, Walker has filed a cross-appeal challenging the district court's denial of Walker's motion for directed verdict. Because we affirm the jury's verdict in Walker's favor, we need not rule on Walker's cross-appeal.

## II. BACKGROUND

The events which gave rise to this lawsuit occurred during the evening hours of July 10, 1992. Schindler and her husband, Gerald, and their children were swimming at the Field Club swimming pool in Omaha. Gerald dove into the pool and hit his head, resulting in a neck injury. Gerald remained conscious and, in fact, was able to walk to the car and be driven to the hospital. Gerald arrived at the hospital conscious and alert, and spoke with the treating staff in the emergency room concerning the diving accident.

In the emergency room, Gerald was treated by Walker. Walker ordered x rays and diagnosed Gerald's injury as a "Jefferson fracture" of his neck. Walker contacted Monasebian, a resident in the neurosurgery department, for a neurological opinion. Monasebian conducted a neurological examination and had Gerald admitted to a patient room in the hospital. Monasebian then contacted Patil for another neurological opinion.

After being admitted, Gerald became drowsy and dozed off. According to Schindler's testimony, Gerald was a restless sleeper. As Gerald fell asleep, he started moving his arms and legs, and family members attempted to hold him still to prevent movement. Gerald then stopped breathing. Gerald was taken to the intensive care unit, where it was concluded that he had suffered a stroke. Gerald remained alive on respirators for approximately 1 week before he died.

Schindler initially filed a petition in the district court on July 8, 1994. The case actually proceeded to trial on the fifth amended petition, which was filed on October 24, 1996. In Schindler's fifth amended petition, she alleged that UNMC, Monasebian, Walker, and Patil (the defendants) had deviated from the standard of care by failing to properly stabilize and protect Gerald's spinal cord. As such, Schindler sought recovery for wrongful death and negligent infliction of emotional distress.

Pursuant to the State Tort Claims Act, Schindler's claims against UNMC and Monasebian were tried to the court. See Neb. Rev. Stat. § 81-8,214 (Reissue 1996). Schindler's claims against Walker and Patil were tried to a jury. After trial, the court found in favor of UNMC and Monasebian on Schindler's wrongful death claim, and the jury found in favor of Walker and Patil on Schindler's claims. The court, however, found in favor of Schindler and against UNMC on Schindler's negligent infliction of emotional distress claim, and awarded Schindler $15,000.

Schindler filed a motion for new trial on November 4, 1996, which was overruled by the district court. Schindler now appeals from the verdicts rendered against her. UNMC has argued a cross-appeal from the verdict rendered in favor of Schindler on her negligent infliction of emotional distress claim. Walker has cross-appealed the denial of his motion for directed verdict.

## III. ASSIGNMENTS OF ERROR

On appeal, Schindler has assigned five errors, which we consolidate for discussion to four. First, Schindler asserts that the district court erred in failing to remove certain potential jurors from the jury pool. Second, Schindler asserts that the district court erred in disallowing testimony concerning an autopsy. Third, Schindler asserts that the district court erred in failing to give a requested instruction concerning missing x rays. Fourth, Schindler asserts that the district court erred in denying Schindler's motion for new trial.

As noted, UNMC has argued as a cross-appeal that the district court erred in awarding Schindler $15,000 on her negligent infliction of emotional distress claim. Walker has asserted on cross-appeal that the district court erred in denying his motion for directed verdict.

## IV. ANALYSIS

### 1. JURY SELECTION

Schindler asserts that the district court erred in "refusing to strike individuals closely related to UNMC, employees and former employees of UNMC and co-employees of appellees Patil and Walker." Brief for appellant at 23. The district court specifically instructed the jury during voir dire that the jury would not be deciding any issues concerning UNMC, because the claims against UNMC would be tried to the court and that the jury was to be concerned only with the claims against Walker and Patil. Schindler made a motion to have the district court remove all potential jurors who had indicated that they were employed by UNMC, which request was denied. We will not discuss whether this motion was adequate to constitute a challenge for cause as to any, or all, of the jurors whom Schindler challenges on appeal, because our discussion of the merits of this claim below obviates the need for any discussion of the sufficiency of Schindler's challenges. We specifically do not hold that the challenges were sufficient, however.

At the conclusion of voir dire, Schindler exercised the four peremptories which the district court granted her in this case. On appeal, she asserts that the four individuals she struck with peremptories should have been removed for cause and that three

additional jurors, who ended up serving on the jury, also should have been struck for cause.

### (a) Standard of Review

The decision to retain or reject a juror is a matter of discretion with the trial court. *State v. Krutilek*, 254 Neb. 11, 573 N.W.2d 771 (1998). Thus, the trial court's decision to retain or reject a juror is reviewed for an abuse of discretion. *Id.* An abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

The competency of a potential juror is generally presumed, and the burden is on the challenging party to establish otherwise. *Id.* A trial judge is not required to excuse a potential juror when the juror is able to decide the case fairly and impartially. *Id.* An appellate court defers to the trial court's decision whenever a juror is unequivocal that he or she can be fair or impartial and whenever a juror is equivocal in his or her ability to be impartial. *Id.* This rule applies both to the issue of whether a potential juror should be removed for cause prior to trial and to the situation of whether a juror should be removed after the trial has commenced. *Id.* Finally, it is important to note that situations will arise where the trial court's impressions of a juror are not reflected in the record. *Id.*

### (b) Jurors Remaining on Jury

The three jurors who remained on the jury and whom Schindler alleges should have been removed as a result of their close relationships to UNMC were jurors Smith, Blair, and Carr. Smith indicated during voir dire that he was an associate professor in the department of pharmacology at UNMC. Smith indicated in response to questions from counsel that he had no relationship with any of the doctors involved in this case and that his work was confined to research, not practicing medicine. Smith indicated that he could be fair and impartial in judgment of Walker and Patil.

Blair was formerly employed by UNMC between 1972 and 1983 in the "patient accounts department in collections." According to Blair, during her term of employment, she had no

contact with any doctors employed by UNMC. Blair indicated that she would have no problem in rendering a verdict warranted by the facts and evidence that would be presented to her during trial.

Carr indicated that his mother-in-law was employed by UNMC, working with student testing and then in the alumni department. According to Carr, he had no feelings toward UNMC which would impact his decision in the case.

It is apparent from the exchanges between these three jurors and counsel during voir dire that none of these jurors expressed an inability to fairly and impartially decide this case. Their responses did not even amount to an equivocal response regarding their ability to be impartial. See *Krutilek, supra.* As such, we conclude that the district court did not abuse its discretion in allowing them to serve on the jury deciding the issues against Walker and Patil.

### (c) Jurors Removed by Peremptories

The four jurors whom Schindler removed with peremptory strikes and whom she alleges should have been removed for cause were jurors Miller, Raynor, Witherby, and Steimle. Miller indicated that she had formerly been employed by UNMC and that her husband was employed by UNMC as a financial officer at the time of trial. Miller indicated that she could be fair and impartial in deciding the case.

Raynor revealed that he had contacts with both UNMC and Patil. Raynor indicated that he was an architect and that he was in the process of fulfilling a multimillion dollar construction contract with UNMC at the time of trial. One of Raynor's brothers graduated from UNMC's medical school and another brother was currently serving his residency at UNMC. Raynor also recognized Patil as being a member of the same church as Raynor. Additionally, Raynor indicated familiarity with attorneys in the law firms representing Walker and Patil. Nonetheless, Raynor indicated that he was confident he could be fair and impartial.

Witherby indicated that he had an uncle who had been a physician in Columbus, Nebraska. According to Witherby, his uncle had retired because of "a so-called malpractice suit." Witherby indicated that he thought he could put his uncle's

experience out of his mind and decide the case on the evidence presented to him.

Finally, Steimle had a sister who worked in the pulmonary research department at UNMC. Steimle indicated, in response to questions from counsel, that she would have no problem rendering a decision based on the evidence.

According to the responses to voir dire questions, none of these four jurors indicated any difficulty in deciding the case fairly and impartially. Pursuant to the Nebraska Supreme Court's holding in *State v. Krutilek*, 254 Neb. 11, 573 N.W.2d 771 (1998), we cannot say that the district court abused its discretion in not removing any of these jurors.

### (d) Implied Bias

Schindler asserts on appeal that all of the above jurors should have been removed from the jury pool on the basis of implied bias, pursuant to our holding in *Kusek v. Burlington Northern RR. Co.*, 4 Neb. App. 924, 552 N.W.2d 778 (1996). In *Kusek*, plaintiff Kusek was an employee of defendant Burlington Northern and was suing Burlington Northern. The trial court allowed the jury to include current employees of Burlington Northern who were coemployees of Kusek and allowed the jury to decide issues between the parties. On appeal, Burlington Northern made similar arguments to those made by Schindler in the present case, that both jurors who remained and served on the jury as well as some who were struck with peremptory challenges should have been removed. This court held that because of implied bias, "all employees of a party are ineligible to serve on a jury in a case involving their employer." *Id.* at 931, 552 N.W.2d at 782.

We decline to extend the holding from *Kusek* to this case. In the present case, UNMC was not a party to the issues being decided by the jury. As such, there is no implied bias on the part of any UNMC employees in deciding issues concerning Walker and Patil. In fact, only one of the seven challenged jurors was even a current employee of UNMC, and none had any professional relationship with Walker and Patil.

Additionally, none of the potential jurors was a coemployee of Walker and Patil, including Smith who is employed by UNMC. Walker and Patil were not considered to be employees

of UNMC in this case. Pursuant to § 81-8,214, tort claims brought against UNMC or its employees are to be tried to a court sitting without a jury. Pursuant to this section, Monasebian, who was a resident at UNMC when these events occurred, was treated as an employee and his case was decided by the court. The cases against Walker and Patil, however, were tried to a jury. As such, because Walker and Patil were not employees of UNMC, Smith was not a coemployee of Walker and Patil.

### (e) Resolution

We decline to extend our holding from *Kusek, supra,* to apply the doctrine of implied bias to the facts of the present case. As such, absent an abuse of discretion by the district court in not removing any of the challenged jurors, Schindler's assigned error is without merit. Because the record indicates that none of the challenged jurors or potential jurors indicated any difficulty in deciding the case against Walker and Patil fairly and impartially, the district court did not commit an abuse of discretion. This assigned error is, therefore, without merit.

### 2. AUTOPSY EVIDENCE

Schindler asserts that the district court erred in disallowing Dr. Matthias Okoye from testifying in her case in chief and in her rebuttal case regarding his findings and results from an autopsy he performed on Gerald. Prior to trial, the defendants filed motions to strike the testimony of Dr. Okoye and any evidence acquired from an autopsy of Gerald's body. A hearing was held on the defendants' motions on October 9, 1996. At the hearing, numerous exhibits were offered, including discovery documents, the autopsy report, and the October 3 deposition of Dr. Okoye. After the hearing, the district court sustained the defendants' motions to the extent that Schindler was prohibited from introducing any evidence related to the autopsy. At the trial, which began October 15, Schindler made motions during her case in chief and rebuttal to allow testimony regarding the autopsy. These motions were denied.

### (a) Parties' Arguments

Schindler argues that the exclusion of Dr. Okoye's testimony regarding the results of the autopsy unfairly prejudiced her at trial. Schindler argues that the district court erroneously con-

cluded that Dr. Okoye had destroyed evidence and that the results of the autopsy could not be reevaluated by experts of the defendants. According to Schindler's brief, if Dr. Okoye had been allowed to testify regarding his autopsy findings, he would have testified that Gerald died as a result of the defendants' mismanagement of an unstable fracture. Also according to Schindler's brief, Dr. Okoye would have further testified that based on his autopsy findings regarding the condition of the vertebral artery, the cause of Gerald's stroke was not a blood clot resulting from the vertebral artery's being crushed during the diving accident as asserted by the defendants.

In response, the defendants argue that Dr. Okoye destroyed evidence in performing the autopsy and that where one party performs destructive testing of important evidence without notice to the other party, evidence related to the testing may be properly excluded. Additionally, they argue that Schindler, despite ample opportunity, did not notify them of the impending autopsy and that failure to do so resulted in their inability to confirm or disprove Dr. Okoye's findings.

### (b) Procedural Background

In the case before us, the defendants made numerous discovery requests relating to Schindler's expert evidence and the performance of an autopsy. Beginning in May 1994, the defendants served interrogatories on Schindler, seeking information regarding the substance, subject matter, and basis of each of her experts' opinions. Schindler was also served a request for production in May 1996, specifically seeking information related to any autopsy or postmortem examination of Gerald. In her response of June 12 to the request for production, Schindler stated that she was "not aware of any autopsy or postmortem examination." In April, Schindler supplemented her responses to interrogatories to include Dr. Okoye as a designated expert. She stated that Dr. Okoye's opinions were based on his "review of the medical evidence."

On September 16, 1996, Schindler applied for a disinterment permit. Her application was notarized by an employee of her attorney. Dr. Okoye performed the autopsy on September 26. Schindler amended her discovery responses on October 1 to

notify the defendants of Dr. Okoye's findings resulting from the autopsy. This was the first notice the defendants received of the autopsy. Trial was scheduled to begin on October 15.

At the pretrial hearing and in response to Schindler's motions at trial, the defendants offered evidence to show that in the course of conducting his autopsy, Dr. Okoye dissected and destroyed the vertebral arteries; that no photographs were taken of the arteries before they were destroyed; and that as a result, Dr. Okoye's findings could not be confirmed or disproved by a second autopsy.

### (c) Relevant Authority

Neb. Ct. R. of Discovery 26(e) (rev. 1996) provides that a party has a duty to seasonably supplement his or her discovery responses as to any question addressed to the identity of an expert and the subject matter and substance of an expert's testimony and as to any prior responses that he or she knows were incorrect when made or, although correct when made, are no longer true and under the circumstances, the failure to amend would be "in substance a knowing concealment."

As a general rule, the range of sanctions imposed for violations of the discovery rules is a matter within the discretion of the trial court. *Booth v. Blueberry Hill Restaurants*, 245 Neb. 490, 513 N.W.2d 867 (1994). See, also, *Martindale v. Weir*, 254 Neb. 517, 577 N.W.2d 287 (1998). Sanctions exist under Neb. Ct. R. of Discovery 37 (rev. 1996) to punish a litigant or counsel who might be inclined or tend to frustrate the discovery process, and the appropriate sanction is to be determined from the factual context of the particular case. Under rule 37, a litigant may make a motion for an order compelling discovery. If the order compelling discovery is not complied with, rule 37 authorizes the imposition of sanctions. Rule 37(b)(2)(B) specifically authorizes the exclusion of evidence where a party fails to comply with a court order regarding discovery. In the present case, there was not a court order in place. Therefore, rule 37 does not specifically apply. However, that does not end our analysis.

Even though a trial court's exclusion of evidence may not be sustained as a rule 37 sanction, it may be sustained as an exercise of a trial court's inherent powers. See, *Dillon v. Nissan Motor Co., Ltd.*, 986 F.2d 263 (8th Cir. 1993); *Unigard Sec. Ins.*

*v. Lakewood Engineering & Mfg.*, 982 F.2d 363 (9th Cir. 1992); *Lewis v. Darce Towing Co., Inc.*, 94 F.R.D. 262 (W.D. La. 1982); *Barker v. Bledsoe*, 85 F.R.D. 545 (W.D. Okla. 1979). The U.S. Supreme Court has recognized that a district court's inherent powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991) (quoting *Link v. Wabash Railroad Co.*, 370 U.S. 626, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962)), *rehearing denied* 501 U.S. 1269, 112 S. Ct. 12, 115 L. Ed. 2d 1097. We note that the inherent power doctrine has been recognized in Nebraska. See, *Wassung v. Wassung*, 136 Neb. 440, 286 N.W. 340 (1939); *Lincoln Lumber Co. v. Elston*, 1 Neb. App. 741, 511 N.W.2d 162 (1993) (holding that district courts have inherent power to do all things necessary for administration of justice within scope of their jurisdiction).

A district court's inherent powers include the broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial. *Dillon, supra*; *Campbell Industries v. M/V Gemini*, 619 F.2d 24 (9th Cir. 1980). Without such inherent power, a court would be powerless to deal with discovery violations that do not specifically involve a court order. *Lewis, supra*. "When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap." *Shepherd v. American Broadcasting Companies, Inc.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995), citing *Chambers, supra*. Appellate review of a district court's use of inherent power is for an abuse of discretion. *Chambers, supra*; *Shepherd, supra*. See, also, *Roemer v. Maly*, 248 Neb. 741, 539 N.W.2d 40 (1995).

Several federal courts have exercised their inherent power to exclude certain evidence where an expert employed by a party conducts an examination of evidence without notice to the other party and negligently or intentionally destroys the evidence to the prejudice of the other party. See, *Dillon, supra*; *Lewis, supra*; *Barker, supra*. But see *State v. Peterson*, 242 Neb. 286, 494 N.W.2d 551 (1993) (holding that trial court did not abuse its discretion in denying motion to suppress expert testi-

mony regarding analysis of substance consumed in testing where defendant had opportunity to cross-examine on foundation matters). In *Lewis, supra*, the defendant moved to exclude all expert testimony derived from an ex parte autopsy of the decedent husband of the plaintiff in a case in which the plaintiff claimed that the defendant employer was liable for the death of her husband. The *Lewis* court held that the plaintiff had breached her duty, absent a court order, to seasonably amend her discovery responses by failing to provide notice of an upcoming autopsy and failing to turn over all documentation related to the autopsy. Under the facts of the case, the defendant had submitted interrogatories to the plaintiff to discover the existence of any reports related to the decedent's death, and the plaintiff did not notify the defendant of her intent to perform an autopsy or provide reports arising from the autopsy until several months thereafter. The court determined that the exclusion of all evidence derived from the autopsy was the appropriate sanction. In determining the appropriate sanction, the court considered five factors: (1) whether the defendant was prejudiced as a result of the ex parte autopsy; (2) whether the prejudice can be cured; (3) the practical importance of the evidence; (4) whether the plaintiff was in good or bad faith; and (5) the potential for abuse if the evidence is not excluded. *Id.*

The facts in *Barker, supra*, are similar to the facts in the case before us. *Barker* was a malpractice action wherein the plaintiff contended that the defendant doctors were liable for the death of his wife. The defendant had submitted interrogatories to the plaintiff requesting the name of plaintiff's expert and the substance and basis for his testimony. During a deposition of the plaintiff's expert, the expert revealed that he had performed an autopsy on the decedent at the direction of the plaintiff's attorney and that the autopsy had destroyed the body. The court prohibited the plaintiff from introducing any evidence related to the autopsy of the decedent. The court stated, in part:

> When an expert employed by a party or his attorney conducts an examination reasonably foreseeably destructive without notice to opposing counsel and such examination results in either negligent or intentional destruction of evidence, thereby rendering it impossible for an opposing

party to obtain a fair trial, it appears that the Court would be not only empowered, but required to take appropriate action, either to dismiss the suit altogether, or to ameliorate the ill-gotten advantage.

*Barker v. Bledsoe*, 85 F.R.D. 545, 547-48 (W.D. Okla. 1979). The court noted that " 'trial by ambush' " is no longer fostered. 85 F.R.D. at 547.

Similarly, in *Dillon v. Nissan Motor Co., Ltd.*, 986 F.2d 263 (8th Cir. 1993), the Eighth Circuit Court of Appeals upheld the district court's exclusion of the plaintiff's expert testimony and exhibits where the plaintiff's experts examined a crucial piece of evidence and destroyed it before the defendant could examine it. Relying on its inherent powers, the district court excluded the plaintiff's expert evidence regarding the destroyed evidence. The court of appeals concluded that the imposition of a sanction was appropriate where a retained witness and counsel destroyed evidence that they knew or should have known was relevant to the imminent litigation without notice to the defendant. *Id.* The court further concluded that the sanction of excluding the evidence was not an abuse of discretion because the destruction of the evidence prejudiced the opposing party. *Id.*

### (d) Application to Facts

It is clear from the record that Schindler and her counsel employed Dr. Okoye to conduct an autopsy which would foreseeably result in the destruction of evidence. The process to set up the autopsy began, at the latest, on September 16, 1996, when Schindler applied for a disinterment permit with the help of her counsel. However, no notice was provided to the defendants regarding the autopsy until October 1, several days after the autopsy was actually performed and approximately 2 weeks before trial. When Schindler decided to have an autopsy conducted, her discovery response that she was unaware of any autopsy was no longer entirely accurate.

For these reasons, we conclude that the district court was justified in finding that the conduct of Schindler, her counsel, and her expert resulted in the destruction of evidence relevant to the case and in finding that Schindler failed to seasonably amend discovery responses which were no longer accurate. Under the

circumstances, the failure to amend was "in substance a knowing concealment." Rule 26(e).

Next, we must determine whether the district court abused its discretion when determining that the exclusion of Dr. Okoye's testimony concerning his findings from the autopsy was the appropriate sanction. In doing so, we utilize the five-factor test set forth in *Lewis v. Darce Towing Co., Inc.*, 94 F.R.D. 262 (W.D. La. 1982).

The first two factors concern the prejudice to the defendants from the actions of Schindler. In determining whether the defendants were actually prejudiced, it is apparent that the defendants were deprived the opportunity to participate in the autopsy or to conduct one of their own. As a result, they were prejudiced because they were unable to seek medical evidence of their own to rebut Dr. Okoye's findings.

Having found that prejudice occurred, the next consideration is whether the prejudice can be cured. We conclude that the only practical means to cure the prejudice which resulted due to the actions of Schindler approximately 2 weeks prior to trial was to refuse to permit Dr. Okoye to testify regarding his findings arising from the autopsy.

The third factor to consider is the practical importance of the evidence Schindler sought to introduce. Dr. Okoye's findings are admittedly of significant probative value to Schindler. Such evidence would have contradicted the defendants' evidence concerning the cause of death. It also would have provided an additional basis for Dr. Okoye's opinion as to the cause of death. However, Dr. Okoye was allowed to testify, without reference to any findings or results from the autopsy, as to his opinion of the cause of death which was contrary to that of the defendants' experts.

The next factor to consider is whether Schindler was acting in good or bad faith. We note that information concerning the autopsy was passed on to the defendants only after it was learned that the results were favorable to Schindler's case. Despite discovery requests designed to learn of the existence of an autopsy and her own responses that she knew of no autopsy, Schindler did not inform the defendants of the autopsy until it was completed. The circumstances can support a conclusion of bad faith.

Finally, the potential for abuse if the evidence is not excluded must be addressed. As stated by one court, if such evidence is not excluded, the court

> would be condoning discovery tactics ripe with potential abuse. . . . [A]utopsies that yield no favorable results . . . could be conveniently forgotten, especially if the results proved favorable to the opposition. The potential for collusion between the parties and their experts is legion and the court refuses to lend its hand to the damaging effect such collusion could have on the integrity of the judicial process.

*Lewis v. Darce Towing Co., Inc.*, 94 F.R.D. at 269.

### (e) Resolution

While the evidence derived from the autopsy may have had significant probative value to Schindler, we note that Schindler was allowed to present Dr. Okoye's opinion as to the cause of Gerald's death without reference to his autopsy findings. We conclude that the district court did not abuse its discretion in excluding from Schindler's case in chief the testimony of Dr. Okoye regarding his autopsy findings. The competing interests discussed above required its exclusion. As the reasons supporting the exclusion of the evidence apply with equal force to its exclusion as rebuttal evidence as well, we also conclude that the district court did not abuse its discretion in excluding the evidence in the rebuttal portion of Schindler's case. See *Westgate Rec. Assn. v. Papio-Missouri River NRD*, 250 Neb. 10, 547 N.W.2d 484 (1996) (holding that it is within trial court's discretion whether to allow rebuttal evidence). This assigned error is without merit.

### 3. JURY INSTRUCTION

Schindler next asserts that the trial court erred in refusing to give an instruction about missing x rays. The record indicates that the x rays taken of Gerald while he was in the emergency room were missing prior to trial and were never available for Schindler's experts to review prior to trial. During the jury instruction conference, Schindler orally requested that the jury be instructed as follows:

> [T]he plaintiffs have presented evidence that the x-rays taken by the Defendants University Hospital, University of Nebraska Medical Center, within the emergency room of Gerald Schindler's cervical spine, as well as the x-rays taken under the direction of the emergency department, are to be within the possession and control of the Defendant University of Nebraska Medical Center but that they have been identified now as missing; that from such evidence, the jury may presume that the missing evidence would be favorable to the plaintiffs. However, the defendants may rebut such presumption by the greater weight of the evidence.

Schindler has not cited us to any authority in Nebraska suggesting that such a presumption has ever been endorsed in this jurisdiction. Schindler does cite us to two cases from other jurisdictions which she argues are persuasive authority for such a presumption. Schindler relies on *Carr v. St. Paul Fire & Marine Insurance Company*, 384 F. Supp. 821 (W.D. Ark. 1974), and *Public Health Trust of Dade Cty. v. Valcin*, 507 So. 2d 596 (Fla. 1987). We do not find either case persuasive on the facts of the present case.

The court's opinion in *Carr* states nothing about any presumption or any specific instruction to the jury. Rather, *Carr* merely states that the jury is entitled to consider the effect of a defendant's having destroyed evidence. The opinion in *Carr* actually dealt with whether it was proper for the trial court to receive evidence suggesting that the defendant hospital had changed certain procedures after the subject evidence had been destroyed. In the case before us, there is no evidence that anybody "destroyed" any evidence, and the jury was not prevented from considering the fact that the x rays were missing. *Carr* does not suggest that any specific presumption arises when evidence becomes missing or that the jury should be specifically instructed as to any such presumption.

In *Valcin*, the court was also confronted with a case where evidence was destroyed, not where evidence merely became missing. Significantly, in *Valcin*, the court stressed that before any presumption can arise from the destruction of evidence, the plaintiff must first prove that he or she was hindered in proving

his or her case because the destroyed evidence was unavailable. On the facts of the present case, there was testimony from numerous experts who all concluded that CT scans and MRI's, which were available to all of the parties, actually provided better views of Gerald's neck and spinal area than any x rays would have. One such expert testified that he was not hampered in forming an opinion in this case by the missing x rays because the CT scans provided the best evidence.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *Kent v. Crocker*, 252 Neb. 462, 562 N.W.2d 833 (1997). In the present case, the requested instruction is not a correct statement of the law in Nebraska at the present time, the instruction was not warranted by the evidence because the evidence indicated that CT scans and MRI's indicated that the x rays would not have been favorable to the plaintiff, and there has been no prejudice demonstrated because the presumption, if one existed, was rebutted by the evidence concerning the quality of the CT scans and MRI's. As such, Schindler has not demonstrated reversible error from the court's refusal to give the requested instruction. This assigned error is without merit.

### 4. MOTION FOR NEW TRIAL

Schindler's argument on appeal concerning the court's denial of her motion for new trial is confined to arguing that a new trial was warranted because of the above-discussed errors. Given our disposition of the other assigned errors, this assigned error is without merit, and we need not discuss it further.

### 5. CROSS-APPEALS

#### (a) UNMC

In its brief, UNMC has argued as a "cross-appeal" that the trial court erred in awarding Schindler $15,000 for negligent infliction of emotional distress. However, UNMC has failed to properly designate this argument as a cross-appeal. According to the Nebraska Supreme Court Rules of Practice, any appellee

has the right to file a cross-appeal. Neb. Ct. R. of Prac. 1E (rev. 1996). The rules provide that an appellee seeking to bring a cross-appeal must note on the cover of the appellee's brief that this is a cross-appeal and prepare the cross-appeal in the same manner as an appellant's brief. Neb. Ct. R. of Prac. 9D(4) (rev. 1996). Among other things, an appellant's brief must include a title page, a table of contents, a statement of the case, assigned errors, propositions of law, a statement of the facts, and an argument section. Neb. Ct. R. of Prac. 9D(1) (rev. 1996).

In the present case, UNMC did not designate a cross-appeal on the cover of the appellee brief. UNMC did not set forth the cross-appeal in a separate section of the brief. UNMC did not include a title page, a table of contents, a statement of the case, assigned errors, propositions of law, or a statement of the facts. UNMC merely added an additional argument to the appellee brief in which it argued this "cross-appeal."

It is firmly established law in this jurisdiction that in order to be considered on appeal, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Lange v. Crouse Cartage Co.*, 253 Neb. 718, 572 N.W.2d 351 (1998). The instant case is an example of an extreme violation of this proposition of law, because UNMC failed to assign *any* errors on cross-appeal, as well as failed to comply with the other procedural rules for bringing a cross-appeal. As such, we decline to address the merits of UNMC's cross-appeal.

### (b) Walker

As noted above, Walker also brought a cross-appeal in this case. Walker properly designated and established his cross-appeal, alleging that the trial court erred in overruling Walker's motion for directed verdict on the wrongful death claim. Because we have already affirmed the jury's verdict in favor of Walker in this regard, we need not further address whether Walker was entitled to a directed verdict.

### V. CONCLUSION

Finding no merit to any of Schindler's assigned errors, we affirm the judgments entered against Schindler and in favor of UNMC, Monasebian, Walker, and Patil. Because UNMC did

not properly present any issue on cross-appeal, we decline to reach the merits of UNMC's claim on appeal. Because of our resolution of Schindler's appeal, we need not reach Walker's cross-appeal.

AFFIRMED.