MARY E. SCHINDLER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF GERALD R. SCHINDLER, APPELLANT AND CROSS-APPELLEE, V. RICHARD WALKER, M.D., APPELLEE AND CROSS-APPELLANT, AND DOUGLAS M. MONASEBIAN, M.D., ET AL., APPELLEES.

592 N.W.2d 912

Filed April 23, 1999.   No. S-97-073.

Daniel B. Cullan and Paul W. Madgett, of Cullan & Cullan, for appellant.

John P. Mullen and Lisa M. Meyer, of Gaines, Mullen, Pansing & Hogan, for appellees University of Nebraska Medical Center and Monasebian.

Joseph F. Bataillon and Kelly K. Brandon, of Sodoro, Daly & Sodoro, for appellee Walker.

William M. Lamson, Jr., and William R. Settles, of Lamson, Dugan & Murray, for appellee Patil.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.

## NATURE OF CASE

This is an action for wrongful death as a result of alleged medical negligence and for negligent infliction of emotional distress brought by appellant, Mary E. Schindler (Schindler), as personal representative of the estate of Gerald R. Schindler, and Schindler, individually, against appellees Richard Walker, M.D.; Douglas M. Monasebian, M.D.; Arun Angelo Patil, M.D.; and the University of Nebraska Medical Center (UNMC) (collectively appellees) for failure to properly treat a C1 neck fracture sustained by Gerald following a diving accident at an Omaha swimming pool. We affirm.

## BACKGROUND

On July 10, 1992, Schindler and her husband, Gerald, and their children were swimming at the Field Club swimming pool in Omaha. Gerald dove into the pool and hit his head, resulting in a neck injury. Gerald remained conscious, walked himself to the car, and was driven to the hospital. Gerald arrived at UNMC conscious and alert, and spoke with the treating staff in the emergency room concerning the diving accident.

In the emergency room, Gerald was treated by Walker. Walker ordered x rays and diagnosed Gerald's injury as a "Jefferson fracture" of his neck. Walker contacted Monasebian, a resident in the neurosurgery department, for a neurological opinion. Monasebian conducted a neurological examination and had Gerald admitted to a patient room in the hospital. Monasebian then contacted Patil for another neurological opinion.

After being admitted, Gerald became drowsy and dozed off. According to Schindler's testimony, Gerald was a restless

sleeper. As Gerald fell asleep, he started moving his arms and legs, and family members attempted to hold him still to prevent movement. Gerald then stopped breathing. After being revived, he was taken to the intensive care unit, where it was concluded that he had suffered a stroke. Gerald remained alive on respirators for approximately 1 week before he died.

Walker is a medical doctor in the emergency department at UNMC and is also an assistant professor in the department of surgery. Patil is a neurosurgeon and a full-time professor of neurosurgery at UNMC. Monasebian is described as a resident in the neurosurgery department and, therefore, as a resident, is employed by UNMC.

Juror David Smith is an associate professor of pharmacology employed at UNMC. Smith said he did not have a professional relationship with Walker, Patil, or Monasebian, but does serve on committees with physicians at UNMC. Smith said he could be a fair and impartial juror.

In Schindler's fifth amended petition, which the case proceeded on, she alleged that appellees had deviated from the standard of care by failing to properly stabilize and protect Gerald's spinal cord. On this basis, Schindler sought recovery for wrongful death and negligent infliction of emotional distress.

Pursuant to Neb. Rev. Stat. § 81-8,214 (Reissue 1996) of the State Tort Claims Act (Act), Schindler's claims against UNMC and Monasebian were tried to the court. Schindler's claims against Walker and Patil were tried to a jury. After trial, the court found in favor of UNMC and Monasebian on Schindler's wrongful death claim and the jury found in favor of Walker and Patil on both of Schindler's claims. The trial court, however, found in favor of Schindler and against UNMC on Schindler's negligent infliction of emotional distress claim and awarded Schindler $15,000.

Schindler filed a motion for new trial which was overruled by the trial court. Schindler appealed the verdicts rendered against her, contending that the trial court erred in failing to remove certain potential jurors from the jury pool, erred in disallowing testimony concerning an autopsy, erred in failing to give a requested instruction concerning missing x rays, and erred in

denying Schindler's motion for new trial. The Nebraska Court of Appeals, in *Schindler v. Walker*, 7 Neb. App. 300, 582 N.W.2d 369 (1998), found no merit to any of Schindler's assigned errors and affirmed the judgments entered against Schindler.

UNMC cross-appealed, challenging the portion of the judgment by the trial court in favor of Schindler on the allegation of negligent infliction of emotional distress. The Court of Appeals declined to address the merits of UNMC's cross-appeal because UNMC failed to comply with the procedural rules for bringing a cross-appeal. We granted Schindler's and UNMC's petitions for further review.

## STANDARD OF REVIEW

The decision to retain or reject a juror is a matter of discretion with the trial court. *State v. Krutilek*, 254 Neb. 11, 573 N.W.2d 771 (1998). Thus, the trial court's decision to retain or reject a juror is reviewed for an abuse of discretion. *Id.*

An abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

Appellate review of a district court's use of inherent power is for an abuse of discretion. See *Roemer v. Maly*, 248 Neb. 741, 539 N.W.2d 40 (1995).

## ASSIGNMENTS OF ERROR

Schindler assigns that the Court of Appeals erred in concluding that the trial court did not abuse its discretion when it (1) failed to strike juror Smith, a coemployee of Walker and Patil and an employee of UNMC, from the venire; (2) did not allow Schindler's expert witness, Dr. Matthias I. Okoye, to testify during Schindler's case in chief about an autopsy; and (3) did not allow Okoye to testify in rebuttal after appellees had offered a defense which had been scientifically disproved by Okoye's autopsy.

Restated, UNMC assigns that the Court of Appeals erred in (1) refusing to address the merits of UNMC's cross-appeal because UNMC failed to comply with Neb. Ct. R. of Prac.

9D(1) and (4) (rev. 1996), and (2) failing to find plain error existed in regard to the trial court's award of $15,000 for negligent infliction of emotional distress in the absence of any finding of negligence against UNMC and the absence of severe emotional distress.

## ANALYSIS

### JURY SELECTION

We have carefully examined the record and, particularly, the testimony of Walker and Patil on the issue of their employment. An examination of the testimony of Walker on direct examination shows the following:

Q. After you completed your training in emergency medicine, where did you — where did you go?

A. I came back to Omaha.

Q. And started practicing where?

A. At St. Joseph Hospital associated with Creighton University.

Q. In the emergency room?

A. That's correct.

Q. How long were you with them?

A. I was at St. Joseph Hospital until September of 1989.

Q. And then after being at St. Joseph's Hospital, where did you go to work?

A. I went to work at University of Nebraska Medical Center in the emergency department.

As to Patil, an examination of his testimony shows:

Q. All right. Doctor, as an associate — now full professor in the department of neurosurgery at the University of Nebraska, do you see patients?

A. That's my primary duty, to see patients.

. . . .

Q. All right. How many neurosurgeons were there in the entire city of Omaha, in 1992?

A. I think probably about ten or eleven.

Q. And six of you were associated with university; is that correct?

A. That's correct.

Q. All right. The other four surgeons would have been associated with which hospitals, if you know?

A. Well, at Creighton, St. Joseph's Hospital and then Bergan Mercy.

Q. All right. Okay. We've established there were three full-time professors at the department of neurosurgery and three part time. In addition to yourself, who was full time in 1992?

A. Well, then we have the resident who is a full time.

. . . .

Q. Doctor, tell us when you first moved to Omaha.

A. I moved to Omaha in, I think, September or October of '87. I have been in Omaha now for nine years.

Q. And when you moved to Omaha, was that to take a position with the university?

A. That's correct.

Q. What position did you take with the university when you came to Omaha?

A. When I came to Omaha, I came as associate professor of surgery in the department of neurosurgery.

Q. Were you recruited to come to Omaha?

A. I was.

Q. And who recruited you to the university?

A. Well, the — actually the regents recruit you, but I was recruited through the section of neurosurgery.

Q. And would that be Dr. Leibrock primarily?

A. Right.

Q. And just tell us, if you will, what the department of neurosurgery consists of at the University Hospital.

A. The department of neurosurgery is a teaching department. Like most departments at the university, we have attending, we have professors and associate professors, assistants.

We also have clinical professors, and our basic function is, number one, they're primarily doctors, medical doctors that take care of patients. And since the art of medicine is a practical art, obviously to teach medical students and residents, we have to do it in the practical manner. And so it consists of practice of medicine.

And in the course of practice, we also educate students and residents. We are — at the present time we have a residency program in neurosurgery at the university.

Although it is clear that Walker and Patil had some type of professional relationship with UNMC, they were not shown to be employees. The record does not reflect that Schindler objected to the consolidation for trial of the cases against UNMC and Monasebian with the cases against Walker and Patil, nor is there any claim by Schindler that the Walker and Patil cases should be tried to the court on the theory that Walker and Patil were employees of UNMC and, therefore, covered under the Act.

In Schindler's several petitions, she asserts that "[t]he exact relationship between the parties is unknown." Schindler alleged that "the University of Nebraska Medical Center held itself out to the public, specifically these physician Defendants . . . as agents of the University of Nebraska Medical Center possessing special knowledge, skill and training in the treatment of emergency trauma . . . ." In its answer, UNMC acknowledged that Monasebian acted as its agent but specifically denied that Walker and Patil were acting as its agents at any time material to this action. In his separate answer, Patil generally denied the allegations that he acted as an agent of UNMC. The record does not include Walker's responsive pleading with respect to the operative fifth amended petition.

Although the jury instructions were not included in the record, Schindler's counsel stated during closing argument: "You need to consider the lawsuit against Dr. Patil and Dr. Walker as if they are separate. I believe that's reflected in the instructions, and you will need to treat those as if they are two separate lawsuits." The verdict forms submitted to the jury clearly indicated that they were to decide only the claims against Walker and Patil.

In Schindler's appeal, the Court of Appeals relied on the holding in *Kusek v. Burlington Northern RR. Co.*, 4 Neb. App. 924, 552 N.W.2d 778 (1996), which relies on *Burnett v. B. & M. R. R. Co.*, 16 Neb. 332, 20 N.W. 280 (1884). In *Kusek*, the Court of Appeals held that all employees of a party are ineligible to serve on a jury in a case involving their employer. In *Kusek*,

Burlington alleged that the jury selection process was flawed because the trial court allowed Burlington employees to be in the jury pool. The trial court did rule that "'site specific'" employees, those working in the same craft as Kusek, would not be allowed to serve on the jury. *Kusek v. Burlington Northern RR. Co.*, 4 Neb. App. at 926, 552 N.W.2d at 779. Despite the trial court's exclusion of some Burlington employees, the Court of Appeals found there was error in the jury selection process because "employees of a party to a lawsuit are disqualified for cause and thus ineligible to serve on a jury in a case involving their employer . . . ." *Id.* at 925, 552 N.W.2d at 779.

The Court of Appeals in *Kusek v. Burlington Northern RR. Co., supra*, recognized that the rationale of the *Burnett* court is simply that jurors must be indifferent between parties and that the common-law rule stems from the presumption of loyalty of employees to their employers. The Court of Appeals further expanded the *Burnett v. B. & M. R. R. Co., supra*, holding when it determined:

> It is possible, and sometimes probable, that employees are disloyal, antagonistic, hostile, spiteful, or all of these things toward their employer. And, in some situations, the bond of loyalty between coemployees (including between fellow union members) is far stronger than any loyalty to the employer. While we cannot say for certain that Burlington employees are loyal or disloyal, it seems apparent that the potential is manifest that jurors who are Burlington's employees and Kusek's coemployees are unlikely to hear the case with a "clean slate" and an open mind. If the employee can automatically strike his or her coemployees as jurors, without any showing of partiality . . . the employer should not be required to have its case decided by its employees. In short, the rule ought to run both ways.

*Kusek v. Burlington Northern RR. Co.*, 4 Neb. App. at 931, 552 N.W.2d at 782.

Although in *Kusek v. Burlington Northern RR. Co., supra*, the Court of Appeals recognized that where a party and a juror are coemployees, the juror might not hear the case with a "clean slate" or open mind, in the present case the Court of Appeals

declined to extend its holding in *Kusek* because the claim against UNMC was not decided by the jury and Walker and Patil were not considered employees of UNMC. *Schindler v. Walker*, 7 Neb. App. 300, 582 N.W.2d 369 (1998).

While there may be merit to the contention that the holdings of *Burnett v. B. & M. R. R. Co., supra,* and *Kusek v. Burlington Northern RR. Co., supra,* should be extended to hold that where one of the parties is a coemployee with a juror, working in the same location and, particularly, in the same capacity, the juror should be held ineligible, that is not the case that is presented by this record.

The record clearly reflects that the action was tried on the theory that the claims against Walker and Patil were not governed by the Act. After introducing the parties and their counsel to prospective jurors, the trial judge stated:

> All right. Now is the time I have to explain this to you, ladies and gentlemen. What we're really going to have is two trials simultaneously, one to you, the jury, and one to me, the Court.
>
> The trial to you, the jury, would be the issues between the plaintiffs and Drs. Richard Walker and Arun Patil, and the trial to the Court would be the issues between the plaintiffs and Dr. Douglas Monasebian and the University of Nebraska Medical Center, and the reason is this: The University of Nebraska Medical Center is a state agency. In other words, they are an agency of the State of Nebraska.
>
> The State of Nebraska through the legislature by law has permitted itself . . . to be subjected to suits in certain instances and a suit on what we call a tort claim, and this is a tort claim. They have by law subjected themselves, the State itself and any state agency, to a lawsuit for a tort claim, and it's by law what we call the State Tort Claims Act.
>
> However, any such suits are tried to the Court and not to a jury. And since this suit is brought by the plaintiffs against not only the University of Nebraska Medical Center and Dr. Douglas Monasebian, who was an employee or agent of the UNMC, claiming negligence as

to all three of the medical doctors, for judicial economy and expedience we try the two together.

So we're going to have a simultaneous trial to you concerning just the issues between the plaintiffs and Drs. Patil and Walker and to the Court concerning the issues between the plaintiffs and the University of Nebraska Medical Center and Dr. Monasebian.

Schindler did not object to this statement or to the ultimate submission of her claims against Walker and Patil to the jury. If Walker and Patil had acted as agents or employees of UNMC when they provided services to Gerald, Schindler's claims against them would have been subject to the Act and she would have had no right to a jury trial. Thus, it necessarily follows that neither the parties nor the trial court considered Walker and Patil to have acted as agents or employees of UNMC at the time of their alleged professional negligence.

Generally, an appellate court will dispose of a case on the theories which were presented in the trial court. *Reavis v. Slominski*, 250 Neb. 711, 551 N.W.2d 528 (1996); *Long v. Hacker*, 246 Neb. 547, 520 N.W.2d 195 (1994). Adherence to this principle precludes an appellate court from regarding Walker and Patil as employees of UNMC for purposes of reviewing the trial court's decision not to remove juror Smith from the panel.

Under the circumstances set out above, we conclude that the trial court did not abuse its discretion in declining to strike Smith from the jury panel.

AUTOPSY EVIDENCE

Schindler asserts that the Court of Appeals erred in failing to find that the trial court abused its discretion in disallowing Okoye from testifying in her case in chief and in her rebuttal case regarding his findings and results from an autopsy he performed on Gerald's body. Prior to trial, appellees filed motions to strike the testimony of Okoye and any evidence acquired from an autopsy of Gerald's body. A hearing was held on appellees' motions in which numerous exhibits were offered, including discovery documents, the autopsy report, and the deposition of Okoye. After the hearing, the trial court sustained

appellees' motions to the extent that Schindler was prohibited from introducing any evidence relating to the autopsy. At the trial, Schindler made motions during her case in chief and rebuttal to allow testimony regarding the autopsy. The motions were denied.

Beginning in May 1994, appellees served interrogatories on Schindler seeking information regarding each of her expert's opinions. Schindler was also served a request for production in May 1996 seeking information regarding any autopsy or post-mortem examination of Gerald. In Schindler's response to the request for production on June 12, 1996, Schindler stated that she was "not aware of any autopsy or postmortem examina-tion." In April 1996, Schindler supplemented her responses to interrogatories to include Okoye as a designated expert. Schindler stated that Okoye's opinions were based on his "review of the medical evidence."

On September 16, 1996, Schindler applied for a disinterment permit. Okoye performed an autopsy on September 26. Schindler amended her discovery responses on October 1 to notify appellees of Okoye's findings resulting from the autopsy. This was the first notice appellees received of the autopsy. Trial was scheduled to begin on October 15.

Neb. Ct. R. of Discovery 26(e) (rev. 1996) provides that a party has a duty to seasonably supplement his or her discovery responses as to any question addressed to the identity of an expert and the subject matter and substance of an expert's testi-mony and as to any prior responses that he or she knows were incorrect when made or although correct when made are no longer true, and under the circumstances, the failure to amend would be "in substance a knowing concealment."

As a general rule, the range of sanctions imposed for viola-tions of the discovery rules is a matter within the discretion of the trial court. *Booth v. Blueberry Hill Restaurants*, 245 Neb. 490, 513 N.W.2d 867 (1994). While there is no applicable rule or statute governing a trial court's exclusion of evidence, a trial court's exclusion of evidence can be sustained as an exercise of a trial court's inherent powers. See, *Dillon v. Nissan Motor Co., Ltd.*, 986 F.2d 263 (8th Cir. 1993); *Unigard Sec. Ins. v. Lakewood Engineering & Mfg.*, 982 F.2d 363 (9th Cir. 1992);

*Lewis v. Darce Towing Co., Inc.*, 94 F.R.D. 262 (W.D. La. 1982). The inherent power doctrine has been recognized previously in Nebraska. See, *Wassung v. Wassung*, 136 Neb. 440, 286 N.W. 340 (1939); *Lincoln Lumber Co. v. Elston*, 1 Neb. App. 741, 511 N.W.2d 162 (1993).

A district court's inherent powers include the broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial. *Dillon v. Nissan Motor Co., Ltd., supra; Campbell Industries v. M/V Gemini*, 619 F.2d 24 (9th Cir. 1980). Without such inherent power, a court would be powerless to deal with discovery violations that do not specifically involve a court order. *Lewis v. Darce Towing Co., Inc., supra.* "When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap." *Shepherd v. American Broadcasting Companies, Inc.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995), citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). Appellate review of a district court's use of inherent power is for an abuse of discretion. *Chambers v. NASCO, Inc., supra; Shepherd v. American Broadcasting Companies, Inc., supra.* See, also, *Roemer v. Maly*, 248 Neb. 741, 539 N.W.2d 40 (1995).

Based on the record in this case, we cannot conclude that the trial court abused its discretion in finding that the conduct of Schindler, her counsel, and her expert resulted in the destruction of evidence relevant to the case and in finding that Schindler failed to seasonably amend discovery responses which were no longer accurate. Schindler applied for a disinterment permit on September 16, 1996, with the help of her counsel, and Okoye performed the autopsy on September 26. No notice of the autopsy was provided to appellees until October 1, several days after the autopsy was performed and about 2 weeks before trial. When Schindler decided to have an autopsy performed, her discovery response that she was unaware of any autopsy was no longer accurate. The failure to amend was "in substance a knowing concealment." See rule 26(e).

Appellees presented an affidavit of pathologist Jerry Jones, who stated that in the course of the autopsy, Okoye removed the first and second cervical vertebrae and that in so doing the ver-

tebral and basilar arteries were destroyed, and that it would not be possible to confirm Okoye's findings with a second autopsy. Jones further stated that Okoye did not take any photographs of either the vertebral or basilar arteries and that the two microscopic sections of what were purported to be the vertebral arteries are so extensively decomposed that adequate evaluation and confirmation of the nature and identity of the vessels in this section are impossible. In the summary of Okoye's autopsy report, it was concluded that the "mechanism of death in this patient is cardiorespiratory failure from brainstem and cerebellar infarction due to the thrashing around of the patient which resulted in compression of the basilar-vertebral arterial system . . . ." If, in fact, Okoye's autopsy amounted to destructive testing with no notice of the autopsy being given to appellees to allow appellees to have simultaneous access to Gerald's body, that fact alone would justify the trial court's exclusion of the autopsy results.

We further conclude that the trial court did not abuse its discretion in determining that the exclusion of Okoye's testimony in Schindler's case in chief regarding his findings from the autopsy was the appropriate sanction. While the evidence derived from the autopsy may have had significant probative value to Schindler, Schindler was allowed to present Okoye's opinion as to the cause of Gerald's death without reference to the autopsy findings.

We do not need to discuss the exclusion of the evidence as rebuttal evidence because the reasons supporting the exclusion of the evidence apply with equal force to its exclusion as rebuttal evidence. See *Westgate Rec. Assn. v. Papio-Missouri River NRD*, 250 Neb. 10, 547 N.W.2d 484 (1996) (holding it is within trial court's discretion whether to allow rebuttal evidence). Therefore, Schindler's assignments of error relating to autopsy evidence are without merit, and we affirm the judgment of the Court of Appeals.

## UNMC's "CROSS-APPEAL"

In its brief, UNMC argued as a "cross-appeal" that the trial court erred in awarding Schindler $15,000 for negligent infliction of emotional distress. The Court of Appeals declined to address the merits of UNMC's cross-appeal because UNMC failed to properly designate its argument as a cross-appeal.

Specifically, UNMC did not designate a cross-appeal on the cover of its brief, as required by rule 9D(4), and it did not set forth the cross-appeal in a separate section of the brief. Further, UNMC did not include a title page, a table of contents, a statement of the case, assigned errors, propositions of law, or a statement of the facts, all of which are required under rule 9D(1). UNMC merely added an additional argument to its brief, and the only indications that it was intended to be a cross-appeal were the capitalized, boldfaced, and centered words "CROSS APPEAL OF UNMC" which preceded UNMC's final argument section. The Court of Appeals further relied on the firmly established proposition of law that in order to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. See *Lange v. Crouse Cartage Co.*, 253 Neb. 718, 572 N.W.2d 351 (1998). The Court of Appeals concluded that UNMC's brief was a violation of this proposition because UNMC failed to assign any errors on cross-appeal, as well as failed to comply with the other procedural rules for bringing a cross-appeal. It is also firmly established that errors which are argued but not assigned will not be considered by an appellate court. *DeCoste v. City of Wahoo*, 255 Neb. 266, 583 N.W.2d 595 (1998).

We conclude that UNMC failed to properly designate its argument as a cross-appeal. As such, the Court of Appeals did not err in declining to address the merits of UNMC's cross-appeal, and we refuse to address such argument here.

## CONCLUSION

The record in this case shows that the parties and the trial court tried this case on the basis that Walker and Patil were not employees of UNMC. To hold otherwise would mean that the claims against Walker and Patil would be under the jurisdiction of the Act and, as such, would have been tried to the trial court rather than the jury. The trial court did not, in this case, abuse its discretion in failing to exclude Smith from the jury panel.

The testimony of Okoye relating to his autopsy findings was properly excluded because Schindler failed to seasonably supplement her discovery responses with respect to the autopsy. The Court of Appeals did not err in concluding that the trial

court did not abuse its discretion in excluding the autopsy evidence. We affirm on this issue.

AFFIRMED.